## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**FRANCHISE FASTLANE, LLC**

     **Plaintiff,**

**v.**

**CANDICE WEETER and**
**RYAN LOGAN,**

     **Defendants.**

**Case No.**

## COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

COMES NOW, Plaintiff, FRANCHISE FASTLANE, LLC ("FFL" or "Plaintiff"), by and through its undersigned counsel, and hereby files this Complaint for Injunctive Relief and Damages against Defendants Candice Weeter ("Weeter"), formerly known as Candice Milton, and Ryan Logan ("Logan") (collectively, "Defendants"). In support hereof, FFL states as follows:

## INTRODUCTION

1.    FFL brings this action against Defendants for injunctive relief and damages arising out of Defendants' ongoing scheme to unfairly compete against FFL.

2.    In this lawsuit, FFL seeks to enforce "Proprietary Matters Agreements"

entered into between FFL and each of Weeter and Logan (collectively, the "Agreements"), which, in addition to addressing other issues, contain a non-disclosure provision, non-competition provision, a provision for non-solicitation of employees, vendors, referral partners and customers, and a non-disparagement provision, all of which are enforceable under Florida law, and to prevent Defendants from violating their contractual obligations to FFL. A true and correct copy of Weeter's and Logan's Agreements with FFL, which are identical in material respects, is attached hereto as Exhibits A and B, respectively, and is incorporated herein by reference.

3.    By bringing this action, FFL seeks to prevent Defendants, and those acting in active concert or participation with them, from violating their contractual obligations to FFL and to recover all legal remedies available to FFL.

4.    During their employment with FFL, Defendants violated the Agreements by, among other things, performing services on behalf of a direct competitor, Sequel Brands, LLC ("Sequel"), using and/or disclosing FFL's confidential information and trade secrets for their own benefit and/or the benefit of Sequel, spreading false and defamatory comments about FFL to FFL's lead sources, referral partners and franchisor clients and otherwise interfering with FFL's business relationships with these sources and communicating with FFL's lead sources and referral partners for the purpose of soliciting prospective franchisees on behalf of

Sequel.

5.    Since their resignation from employment with FFL, Defendants have engaged in further violations of the Agreement, including continuing to perform services for Sequel, using and/or disclosing FFL's confidential information and trade secrets for their own benefit and/or the benefit of Sequel, and soliciting FFL prospective customers to cease doing business with FFL or its clients, and to instead do business with Sequel.

6.    Defendants' efforts to compete with FFL, including through using and/or disclosing its confidential information and trade secrets, disparaging FFL, working for a direct competitor of FFL, and soliciting FFL's lead sources and referral partners to refer prospective customers to Sequel instead of FFL, represent a blatant disregard for their restrictive covenant obligations to FFL.

7.    Defendants also have not heeded FFL's demand to cease and desist from violating their continued contractual obligations owed to FFL.

8.    Accordingly, pursuant to the Agreement, FFL now seeks damages from Defendants for breach of contract, breach of duty of loyalty and fiduciary duty, tortious interference with contract and business relations, trade secret misappropriation, conversion, and civil conspiracy, as well as injunctive relief to prevent the continuing irreparable harm arising from Defendants' misconduct.

## PARTIES, JURISDICTION, AND VENUE

9.     At all times relevant hereto, FFL is and was a Delaware limited liability company, with its principal place of business in Omaha, Nebraska, is authorized and licensed to do business in the State of Florida, and is in fact doing business in Hillsborough County, Florida.

10.    At all times relevant hereto, Defendant CANDICE WEETER, an individual, is and was a resident of Hillsborough County, Florida and is not in the military service, is over the age of 18 and is otherwise *sui-juris*.  Defendant is a former employee of FFL. Weeter can be served with process at her place of residence, or by any other means authorized by law.

11.    At all times relevant hereto, Defendant RYAN LOGAN, an individual, is and was a resident of Hillsborough County, Florida and is not in the military service, is over the age of 18 and is otherwise *sui-juris*.  Defendant is a former employee of FFL. Logan can be served with process at his place of residence, or by any other means authorized by law.

12.    This Court has personal jurisdiction over Defendants as they are citizens of and domiciled in the State of Florida. This Court also has personal jurisdiction pursuant to Fla. Stat. § 48.193 because Defendants entered into and breached the Agreement with FFL while in the State of Florida.

13.    Venue in this action is proper in in the Middle District of Florida,

Tampa Division, pursuant to 28 U.S.C. § 1391(b) because both Defendants are residents of Florida, in this District, and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

14.    This Court has original jurisdiction over the subject matter of this action under 28 U.S.C. § 1331, because FFL asserts claims against Defendants for violations of federal law under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 *et seq*. This Court has supplemental jurisdiction over FFL's state-law claims under 28 U.S.C. § 1367(a), because they are so related to claims within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

15.    All conditions precedent to the filing of this action have been performed, satisfied, or waived.

## FACTUAL ALLEGATIONS

### *FFL's Business and Confidential Information*

16.    FFL is engaged in the business of outsourced franchise development, sales, and marketing services for franchisors. As a franchise sales organization, FFL partners with emerging and established franchisors to manage the entire franchisee sales lifecycle, from initial lead generation and prospect qualification through to deal closure. FFL leverages industry-leading technology, a rigorous diligence and onboarding process, and a team of experienced sales executives to help franchisors

grow their brand and sell franchises to prospective franchisees.

17.    FFL distinguishes itself from competitors through a combination of rigorous brand vetting, innovative development programs, and a commitment to responsible, accelerated growth. Unlike many franchise sales organizations, FFL employs a hyper-selective process, evaluating hundreds of brands annually but only partnering with those that demonstrate strong potential, clear differentiators, and scalable business models. This selective approach has played a significant role in expanding franchises across thousands of communities in the United States.

18.    Some of the franchise brands that FFL sells to prospective franchisees include bodenvy and The Exercise Coach.

19.    FFL conducts a rigorous selection process and is well known in the franchise community for only working with high quality franchise brands.

20.    FFL has developed and maintained, at significant expense, valuable and long-standing working relationships and substantial goodwill with its client's franchisees and prospective franchisees. FFL works closely with franchisors to understand their unique needs and tailors its development strategies to ensure that each client receives personalized attention and support throughout the franchise sales process.

21.    FFL also relies heavily on cultivating and maintaining strong business relationships with its lead sources and referral partners, which are essential to its

success in sourcing prospective franchisees. FFL is well known in the franchise consultant community, and its reputation for integrity and results attracts a steady stream of qualified franchisees and leads from trusted industry partners and franchise consultant networks. In addition, FFL has invested millions of dollars over the years in building its key employee relationships and reputations with its lead sources and referral partners. Generating prospective franchise leads through its relationships with its consultant networks is eighty-five to ninety percent of FFL's business.

22.     Barring any external factors beyond FFL's control, such as misconduct by its employees or former employees, FFL has reasonably come to expect that its strong reputation and long-standing relationships with franchisors, prospective franchisees, lead sources and referral partners will continue into the future.

23.     To have a competitive advantage in the franchise development and sales industry, FFL strategically provides its key employees, including Defendants, with substantial training, including skills and knowledge, to perform the services that FFL offers, and unique knowledge of and access to FFL's confidential and proprietary information and materials including, but not limited to, FFL's trade secrets, business strategies, including pricing and sales strategies, financial data, marketing plans, franchisor/client lists, franchisee lists, prospective franchisee lists, lead source/referral partner information, operational procedures, and other information designated as confidential, either expressly or by the circumstances in

which it was provided (collectively, the "Confidential Information").

24.    FFL developed the Confidential Information at significant expense and effort, the Confidential Information is not generally available to the public or to FFL's clients or lead sources or referral partners, and FFL derives economic value from its Confidential Information.

25.    Because the Confidential Information is critical to FFL's position in the franchise development and sales industry, FFL takes reasonable efforts to maintain the confidentiality of such information, including having its employees with access to such information sign confidentiality agreements, using password-protected computers and devices, requiring employees to return company property when they leave the company, requiring franchisor clients and brands to treat FFL's Confidential Information as confidential, and sending letters to all departing employees reminding them of their obligations to protect FFL's Confidential Information and return Company property.

26.    If FFL's Confidential Information were to fall into the hands of a competitor, or if former employees such as Defendants were to retain and/or use the Confidential Information after their employment ended to interfere with FFL's relationships with its clients, lead sources and/or referral partners, or otherwise to compete against FFL, FFL's competitive position would be severely harmed.

### *Defendants' Employment with FFL*

27.    On June 24, 2022, Candice Weeter accepted an offer of employment for a full-time position as a Director of Franchise Development with FFL.

28.    On July 15, 2022, Ryan Logan accepted an offer of employment for a full-time position as a Director of Franchise Development with FFL.

29.    During their employment, Defendants engaged in sales efforts on behalf of FFL, including developing and maintaining direct and continuous relationships with franchisor client accounts, lead sources and referral partners. Defendants' duties, which were without regard to geographic scope, included maintaining relationships with franchisor clients, lead sources and referral partners based across the United States that have a need for FFL's services.

30.    In 2025, prior to her departure, Weeter's total gross compensation was $262,280.27.

31.    In 2025, prior to his departure, Logan's total gross compensation was $240,686.08.

32.    In their roles as Directors of Franchise Development, Defendants were tasked with: (a) communicating frequently with prospects and current franchisor clients; (b) building trusted relationships with and continually communicating with lead sources and referral partners; (c) attending multiple consultant network events throughout the year to promote their brands and build and nurture relationships with

franchise consultants; (d) generating new franchise business and increasing the scope of existing franchise business; (e) sourcing prospective franchisees and selling FFL's portfolio of franchisors to prospective franchisees; (f) building and managing a sales pipeline to accurately forecast future franchise business and meeting sales goals; (g) comprehensively understanding FFL's services; and (h) following the direction of their supervisors and otherwise abiding by FFL's policies and procedures.

33.    As a result of Defendants' employment with FFL, they developed a significant number of contacts and relationships with FFL's franchisor clients, franchisees and prospective franchisees, lead sources and referral partners.

34.    In or about July of 2025, upon information and belief, Defendants either approached or were approached by former FFL employee, Jennifer Cain ("Cain"), a current employee of Sequel.

35.    Upon information and belief, Cain actively solicited Weeter and Logan to resign from FFL and accept employment with Sequel, a direct competitor of FFL.

36.    Upon information and belief, Defendants began working for Sequel, including Weeter having an active Sequel work email account, while they were still employed at FFL.

37.    Upon information and belief, while still employed at FFL, Defendants actively solicited FFL's lead sources and referral partners in order to refer FFL's

prospective franchisees to use Sequel brands instead.

38.     On July 17, 2025, while still employed at FFL, Defendants attended a networking event for business-related purposes. An important part of the event was a dinner networking boat cruise with the FranChoice Consultant Network ("FranChoice"), FFL's top lead source and referral partner. Approximately one hundred FranChoice consultants attended the event as well as many of FFL's franchisor clients.

39.     During the course of the cruise, Defendants announced in a public manner to the attendees of the cruise that they intended to resign from FFL due to the "systemic toxic culture" at FFL.

40.     During the cruise Defendants disseminated false and defamatory statements about FFL to its lead sources, referral partners, and franchisor clients, who were present at the event. Specifically, Defendants communicated to the lead sources, referral partners, and franchisor clients that FFL is having "issues" and "has a systemic toxic culture."

41.     The dissemination of these false and defamatory statements led to significant concern among the lead sources, referral partners, and franchisor clients, prompting them to question the stability of FFL.

42.     Following the cruise, on July 31, 2025, Defendants each resigned from employment with FFL.

43.    In the days leading up to their last day of employment and after their employment ended, Defendants accessed numerous business-related files on their respective FFL-issued work laptops and through their respective OneDrive accounts.

44.    Upon information and belief, these files contain FFL's highly proprietary and confidential information, including trade secrets. Specifically, one document that Weeter accessed, both during and after her employment at FFL, is entitled "Canopy Franchise Fee_Commission Structure.xlsx," which is a spreadsheet containing FFL's highly confidential pricing structure. If a competitor were to have access to and use this document, they would obtain knowledge as to what FFL charges in commissions for its brands. As noted above, to protect this Confidential Information, FFL requires brands to maintain the confidentiality of the terms of their agreements with FFL.

45.    Another file that Weeter accessed leading up to her last day of employment is a spreadsheet titled "Call Log.xlsx," which contains a partial list of FFL's prospective franchisees and the markets in which they live or are interested. Weeter accessed this document for the sole purpose of competing against FFL as her job duties at FFL did not at the time require her to access or use such document. Indeed, a competitor having access to such document could use it to solicit business from these prospective franchisees to compete for brands that FFL may offer.

46.    In addition, in the days leading up to her last day of employment and

even weeks after her employment ended, Weeter continued to access FFL's confidential and proprietary information and trade secrets, including brand presentations, Unit Economic Workbooks, brand 2 Minute Drills, and Confirmation Day Agendas. Weeter's job responsibilities during this relevant time period did not require her to access or use these particular documents or files.

47. In the days leading up to his last day of employment and immediately thereafter, Logan accessed FFL's confidential and proprietary information, including brand presentations, Unit Economic Workbooks, brand approval letters, and Confirmation Day Agendas. Logan's job responsibilities during this relevant time period did not require him to access or use these particular documents or files.

48. Further, both during and immediately after his employment at FFL, Logan used his FFL-issued laptop to access Sequel's computer and email systems.

49. Upon information and belief, Defendants are continuing to use FFL's confidential and proprietary documents in connection with their employment at Sequel.

### *Terms of the Agreements*

50. On or about June 24, 2022, in connection with and as a condition of Weeter's employment by FFL and access to its Confidential Information, Weeter executed FFL's "Proprietary Matters Agreement." Ex. A.

51. On or about July 15, 2022, in connection with and as a condition of

Logan's employment by FFL and access to its Confidential Information, Logan executed FFL's "Proprietary Matters Agreement." Ex. B.

52.    By executing the Agreements, Defendants acknowledged and agreed to comply with certain restrictive covenants both during and following the end of their employment with FFL. *See* Exs. A-B, § 1, 4–6.

53.    Specifically, as relevant here, Section 1 of the Agreements entitled "Nondisclosure of Confidential Information" defines "Confidential Information" as follows:

> Company's and its affiliates' confidential and proprietary information, whether in writing or other form, and which includes, without limitation, Company's customers, prospective customers, and referral sources (including all customer lists and referral source lists); billing, collection, and financial data; memoranda and related research; proprietary software and the related source code; marketing concepts and strategies; training programs and related materials; business plans; strategic plans; pricing plans or methods; Intellectual Property; ideas; inventions; methods; designs; drawings; specifications; improvements; proposals; requests for proposals; research findings; studies and reports; products; services; technology or procedures offered or used by Company and its affiliates; and other related information regarding the business of Company and its affiliates and their products and professional services. Employee expressly acknowledges and agrees that Confidential Information may include, without limitation, confidential and proprietary information belonging to various third parties, such as Company's customers, prospective customers, vendors, suppliers and referral sources, but which has been and will be entrusted to Company for use by Company to conduct its business.

*See* Exs. A-B, § 1(a).

54.    Under Section 1, Defendants also expressly agreed that "during and

after [their] employment with [the] Company," they "shall not directly or indirectly disclose to any person or entity or use for any purpose or permit the exploitation, copying, or summarizing of any Confidential Information, except as specifically required in the proper performance of [Defendants'] duties for [the] Company.  *See* Exs. A-B, § 1(c).

55.    Section 1 also states, in relevant part, that FFL "considers much of its Confidential Information to constitute trade secrets ("Trade Secrets") that have independent value, and provide [the] Company with a competitive advantage over its competitors who do not know the Trade Secrets, and are protected from unauthorized disclosure under applicable law."  *See* Exs. A-B, § 1(d).  Defendants also expressly acknowledged and agreed "that the Confidential Information is protected from unauthorized disclosure or use due to [Defendants'] covenants under this Agreement and [Defendants'] fiduciary duties as an employee of [the] Company."  *Id.*

56.    Further, Section 5 of the Agreements entitled "Noncompetition" provides in pertinent part:

> In order to prevent the improper use of Confidential Information and the resulting unfair competition and misappropriation of Goodwill and other proprietary interests, Employee agrees that, while Employee is employed by Company or any of its affiliates and for a period of eighteen (18) months following the termination of Employee's employment for any reason whatsoever, whether such termination is voluntary or involuntary, and regardless of cause, Employee shall not, except in performance of Employee's duties on behalf of Company,

directly or indirectly, be involved as an owner, partner, shareholder, joint venturer, director, officer, employee, agent, independent contractor, or otherwise, of any entity or business that competes with Company or any of its affiliates, including, but not limited to, any Franchise Broker (as defined below) ***and any entity or business that provides products or services Company or any of its affiliates was developing during Employee's employment with Company or any of its affiliates***.

*See* Exs. A-B, § 5 (emphasis added).

57.    The absence of a specific geographic restriction is construed as a national geographic restriction covering the territories in which FFL operates to protect the use of FFL's Confidential Information, including franchisor client, franchisee and prospective franchisee and lead source and referral partner information, by direct competitors. The national scope of the geographical restriction is especially important given the highly specialized and competitive market, the national reach of FFL's franchise-based business with services that are electronic in nature, and the fact that FFL does not assign Directors of Franchise Development to contact clients, lead sources, and referral partners solely in one geographic area or region.

58.    Under Section 8 of the Agreements, entitled, "No Other Employment or Business Ownership," Defendants expressly agreed that during the term of their employment with FFL, they "shall devote [their] full working time, attention, knowledge, and skills to the business and interests of [FFL], unless otherwise approved in advance by [FFL]." *See* Exs. A-B, § 8.

59.    The Agreements also include a non-solicitation provision in Section 4 entitled "Nonsolicitation of Employees, Vendors, Referral Sources and Customers":

> In order to prevent the improper use of Confidential Information and the resulting unfair competition and misappropriation of Goodwill and other proprietary interests, Employee agrees that, while Employee is employed by Company or any of its affiliates and for a period of eighteen (18) months following the termination of Employee's employment for any reason whatsoever, whether such termination is voluntary or involuntary, and regardless of cause, Employee will not, directly or indirectly, on Employee's own behalf or by aiding any other individual or entity:
>
>     a. Encourage, discourage, interfere with, or otherwise cause or attempt to cause, in any manner, any referral source, vendor, or supplier of Company or any of its affiliates to curtail, sever, or alter its relationship or business with Company or any of its affiliates; or
>
>     . . .
>
>     c.  Call on, solicit, divert, serve, or accept business from, or attempt to solicit or divert any Customers, except in performance of Employee's duties on behalf of Company.

*See* Exs. A-B, § 4.

60.    Section 4 defines "Customer" as "a) any ultimate end customer individual or entity whom [FFL] is introduced to or referred to; and b) any ultimate end customer individual or entity to which [FFL] provides its products or services; provided, however, that the restrictions of this Section 4.c. following the termination of Employee's employment shall only apply to Customers with whom [FFL] did business or solicited for business during the twelve (12) month period immediately prior to the termination of Employee's employment." *See* Exs. A-B, § 4.

61.    Under Section 6, entitled, "Non-Disparagement," Defendants agreed that, while employed by FFL and "following the termination of [their] employment for any reason whatsoever, whether such termination is voluntary or involuntary, and regardless of cause, [they] shall not make any disparaging or defamatory comments regarding [FFL] or any of [its] respective directors, managers, officers, employees or investors. *See* Exs. A-B, § 6.

62.    The Agreements are governed by the laws of the State of Florida. *See* Exs. A-B, § 15(b).

63.    Notably, Defendants expressly acknowledged that the restrictive covenants in the Agreements are "both necessary and reasonable to protect the legitimate business interests of [FFL]," and that "they will not unduly restrict [their] opportunity to earn a reasonable living following the termination of [their] employment." *See* Exs. A-B, § 7(b).

64.    Defendants further acknowledged and agreed that any breach of the terms contained in the Agreements "will result in irreparable and continuing damage to [FFL] for which there may not be an adequate remedy at law," and that "in addition to the recovery of damages and any other legal relief to which [FFL] may be entitled in the event of [their] violation of this Agreement, including, but not limited to, an equitable accounting of all profits and benefits arising out of such breach or threatened breach, and all losses, damages, costs and expenses arising therefrom, including,

without limitation, reasonable attorneys' fees and costs, [FFL] shall also be entitled to equitable relief (without the necessity of proving the inadequacy of monetary damages or the posting of any bond or security), including such injunctive relief as may be necessary to protect the interests of [FFL]." *See* Exs. A-B, § 11.

65.    Thus, according to express provisions of the Agreements, the non-compete and non-solicitation provisions continue to be in full force and effect following the termination of Defendants' employment with FFL for a period of 18 months.

### *Defendants' Post-Termination Conduct*

66.    Despite the restrictive covenants to which they agreed by signing the Agreements, Defendants have continued to engage in unfair competition against FFL in violation of their obligations under the Agreements since their employment ended on July 31, 2025.

67.    Shortly after their employment ended, Defendants began working for Sequel, a direct competitor, in violation of the non-compete provision.

68.    Indeed, upon information and belief, both Defendants began performing work for Sequel prior to their last day of employment with FFL.

69.    Sequel operates as a franchise platform, launching and managing fitness and wellness franchises.

70.    Sequel poses a significant competitive threat to FFL due to the

overlapping nature of lead sources and referral partners for prospective franchisees, as well as shared lead sourcing strategies in attending multiple consultant network events throughout the year to promote their franchisor brands and build and nurture relationships with franchise consultants. This overlap directly places Sequel in competition with FFL for market share and client acquisition.

71.     Given that both companies utilize the same lead sources to identify and attract prospective franchisees, if a lead source refers a prospective franchisee to Sequel instead of FFL, FFL's brands lose out on critical opportunities for growth and expansion. This competitive dynamic not only undermines FFL's business prospects but also threatens its relationships with existing and potential franchise partners.

72.     Oftentimes, lead sources are able to successfully solicit prospective franchisees to consider franchisors that sell products or brands that are unrelated to each other. And these prospective franchisees often buy only one product or brand. Accordingly, if a lead source refers a prospective franchisee to a Sequel brand, the prospective franchisee would likely not consider FFL's franchisor clients that sell brands both within and outside the wellness space.

73.     Sequel's ownership of franchises that market brands and products similar to those offered by FFL also creates a competitive landscape that significantly influences the choices of prospective franchisees. These individuals are

often indifferent to specific brands, prioritizing partnerships with franchisors that offer a diverse array of brands across various industries. This brand-agnostic approach can lead prospective franchisees to favor certain brands over others. For instance, FFL solicits prospective franchisees for its client, The Exercise Coach, a fitness franchise that offers one-on-one personal training using the latest and patented fitness technology to drive the workouts. Likewise, Sequel's brand, Body20, delivers personalized small group and one-on-one strength training, using tech-driven methods. Upon information and belief, both The Exercise Coach and Body20 actively promote 20-minute training sessions. The presence of these competing brands from Sequel and FFL plays a pivotal role in shaping the decisions of prospective franchisees, potentially impacting FFL's market share and growth opportunities.

74.     Upon information and belief, Defendants, on behalf of Sequel, are providing services that are identical or substantially similar to those they provided while working at FFL. That is, they are: (i) soliciting prospective franchisees to purchase Sequel brand franchises at the expense of these same prospective franchisees considering FFL's client's franchises, both in and outside the wellness space; and (ii) engaging with the same lead sources and referral partners as FFL for the same prospective franchisees across the United States.

75.     Additionally, in direct violation of the non-disclosure provision, FFL

has recently learned that Defendants accessed numerous files both immediately prior to and following their departure, which files, upon information and belief, were previously stored on Defendants' FFL-issued laptop and contain FFL's proprietary and Confidential Information, and were later accessed through OneDrive without FFL's consent or permission.

76.    Upon information and belief, Defendants used such files containing FFL's Confidential Information, including information about its lead sources and referral partners, in order to solicit FFL's lead sources and referral partners to refer prospective franchisees to do business with them and/or Sequel, and not FFL.

77.    Upon information and belief, Defendants are continuing to use such files in connection with their employment at Sequel.

78.    Further, in direct violation of the non-solicitation provision, FFL has recently learned that Weeter, through continuing to communicate directly with FFL's lead sources and referral partners, solicited at least one prospective franchisee of FFL with whom she had been working while employed by FFL to solicit them to do business with Sequel instead.

79.    On or about July or August 2025, Weeter communicated with a prospective franchisee of FFL, John Doe 1,[1] with the intent to dissuade him from

---

[1] FFL has redacted the names of its prospective franchisees in order to protect their privacy interests. Upon request, FFL will send an unredacted version to the Court under seal.

entering into a business relationship with FFL's client. John Doe 1 was on the verge of acquiring two franchise units from FFL's brand, bodenvy, amounting to a total investment of $110,500, of which FFL would earn $43,400. This transaction was poised to provide FFL with a continuous revenue stream, calculated at 1% of the total revenue generated by John Doe 1 from these franchise units over the span of his 10-year franchise agreements.

80.    Subsequent to Weeter's solicitation, John Doe 1 abruptly terminated all communications with FFL, thereby halting the progression of the franchise acquisition process.

81.    Upon information and belief, John Doe 1 opted to purchase franchise units from Sequel's brand instead, a decision directly influenced by Weeter's solicitation efforts. This diversion of business represents a significant loss to FFL, both in immediate revenue and long-term financial benefits.

82.    On or about July or August 2025, Weeter communicated with another prospective franchisee of FFL, John Doe 2, again with intent to dissuade him from entering into a business relationship with FFL's clients.

83.    As a result of Defendants' actions, FFL has experienced financial losses, including losing potential customer, lead source and referral partner relationships as well as damage to its reputation and goodwill.

84.    On August 13, 2025, after discovering Defendants' new employment

status, FFL, through counsel, sent a letter to Sequel via e-mail, informing it of Defendants' continued obligations to FFL. A true and correct copy of this cease-and-desist letter is attached hereto as **Exhibit C**.

85.    Also, on August 13, 2025, FFL, through counsel, sent letters to Weeter and Logan, demanding that they abide by their contractual obligations under the Agreements. A true and correct copy of these cease-and-desist letters is attached hereto as **Exhibits D and E.**

86.    In particular, FFL explained in the letters to Sequel and Defendants that to the extent Defendants' employment with Sequel "involve selling franchises and/or utilizing the same lead sources as the sources [Defendants] utilized during [their] employment with [FFL], such activities will be a direct violation of [their respective Agreements]." **Exs. C-E.**

87.    FFL demanded written certification within five business days of the date of the letters for Sequel and Defendants to represent that Sequel will not employ Defendants "in violation of their contractual obligations to [FFL]" and that Defendants "will not commit any breaches of said obligations, including but not limited to selling franchises and/or utilizing the same lead sources as [they] used when [they] were employed by [FFL]." **Exs. C-E**.

88.    FFL did not receive a response from Sequel. Instead, on August 19, 2025, FFL received a response letter from Defendants' counsel. A true and correct

copy of this letter is attached hereto as **Exhibit F**.

89.    In the letter, Defendants' counsel represented that Defendants are continuing to abide by their contractual obligations but noted his belief that solicitation of "potential referral sources that are not exclusive to FFL and are generally known in the industry, including but not limited to those already known to [Defendants'] subsequent employers, would not violate these covenants." **Ex. F**.

90.    Defense counsel also stated that Sequel is not a "Franchise Broker" as used and defined in Section 5 of the Agreements but instead operates as a potential client of FFL. **Ex. F**.

91.    Contrary to defense counsel's assertions, and as FFL's counsel explained to defense counsel in a follow-up call, the non-solicitation provision does not limit a referral source to only those that are exclusive to FFL. Instead, it expressly uses the phrase "any referral source" of FFL.

92.    Further, the non-compete provision is not limited to a "Franchise Broker," but rather also prohibits Defendants from being employed by "any entity or business that provides products or services" that FFL provides during their employment with FFL. As described above, FFL and Sequel provide the same or similar products or services to prospective franchisees and use the same lead sources and referral partners to identify and attract prospective franchisees.

93.    Accordingly, as Defendants are continuing to violate their Agreements,

FFL files the present action.

## COUNT ONE
## BREACH OF CONTRACT
### (Injunctive Relief and Damages as to Defendants)

94.     FFL realleges, and incorporates by reference, the allegations of Paragraphs 1 through 93 as if fully set forth herein.

95.     Defendants entered into valid and enforceable Agreements, supported by adequate consideration, including their employment with FFL and access to FFL's Confidential Information.

96.     The covenants contained in the Agreements remain in full force after Defendants' departure from FFL and Defendants remain bound by those covenants.

97.     FFL satisfied all of its obligations under the terms and conditions of the Agreements, and FFL has legitimate business interests that support the enforcement of the restrictive covenants contained in the Agreements. Specifically, as detailed above, during their employment, FFL provided Defendants with nearly unfettered access to its Confidential Information, including trade secrets. During their employment, FFL assisted Defendants in developing the skills and knowledge necessary to perform the services that FFL offers. During their employment, FFL facilitated Defendants' establishment and maintenance of relationships with customers and lead sources and referral partners, which was done on behalf of FFL and not for the benefit of Defendants personally. FFL also has legitimate business

interests in customer and prospective customer goodwill in the applicable marketplace for franchise development and sales.

98. By the acts described above, Defendants have breached the Agreements by, among other things, (i) working for a direct competitor, Sequel, both during and after their employment at FFL, to provide the same or substantially similar services to those they provided while working at FFL, including soliciting prospective franchisees to purchase Sequel brand franchises at the expense of these same prospective franchisees considering FFL's client's franchises, both in and outside the wellness space, and engaging with the same lead sources and referral partners as FFL for the same prospective franchisees across the United States; (ii) soliciting FFL's prospective franchisees to terminate their business relationship with FFL and to instead do business with Sequel; (iii) disparaging FFL to FFL's lead sources, referral partners, and franchisor clients; and (iv) utilizing and/or disclosing FFL's confidential information and trade secrets for their own benefit or the benefit of Sequel.

99. As a result of Defendants' breaches of the Agreements, FFL has suffered and will continue to suffer substantial irreparable harm and is threatened with further irreparable harm, including, but not limited to, lost business opportunity, lost profits, and damage to its customer relations, business reputation and goodwill, for some of which injuries there is no adequate remedy at law.

100.   FFL is likely to prevail on the merits of its claims because Defendants have breached the restrictive covenants in the Agreements, which are enforceable under Floria law.

101.   The harm to Defendants should preliminary injunctive relief be granted to restore the status quo ante would be far outweighed by the harm to FFL if no such relief were granted.

102.   Granting FFL's requested relief will not disserve the public interest, and in fact will serve the public's interest in upholding valid contracts.

103.   FFL has an urgent need to prohibit Defendants from continuing to unfairly compete with FFL, including soliciting additional prospective franchisees of FFL and using and/or disclosing FFL's Confidential Information, including trade secrets. No other adequate remedy at law exists. Defendants have refused to acknowledge their continuing obligations to FFL and cease their unlawful conduct.

104.   Based on the foregoing, FFL requires injunctive relief, including ordering Defendants to comply with their contractual obligations.  Unless injunctive relief is granted, FFL will continue to be irreparably harmed.

105.   Although inadequate, FFL is still entitled to an award of damages against Defendants for breaches of the Agreements.

106.   By the acts described above, Defendants breached the "no other employment" provision (Section 8) by not devoting their full working time and

- 28 -

efforts to FFL but instead working for Sequel during their employment, the non-compete provision by working for a direct competitor, Sequel, breached the non-disparagement provision by disparaging FFL to FFL's lead sources, referral partners, and franchisor clients, and breached the non-disclosure provision by using and/or disclosing FFL's Confidential Information for their own benefit or the benefit of Sequel.

107.   With respect to Weeter, Weeter also breached the non-solicitation provision by soliciting FFL's prospective franchisees to terminate their business relationship with FFL and to instead do business with Sequel.

108.   Defendants' breaches of the Agreements have caused and will continue to cause FFL to suffer monetary damages for which FFL is entitled to recover, which damages include, but are not limited to, the costs of conducting an investigation into Defendants' conduct, the cost of taking corrective action, and damages to its reputation and resulting financial losses, which amounts of damages will be proven at bench trial.

**COUNT TWO**
**BREACH OF DUTY OF LOYALTY**
**(As to Defendants)**

109.   FFL realleges, and incorporates by reference, the allegations of Paragraphs 1 through 108 as if fully set forth herein.

110.   Defendants were employed by FFL as Directors of Franchise

Development until their employment ended on July 31, 2025.

111.  As employees of FFL, Defendants owed a duty of loyalty to FFL.

112.  By providing services for a direct competitor, Sequel, while still employed at FFL, Defendants breached their duty of loyalty to FFL. Specifically, upon information and belief, Defendants, while still employed at FFL, actively solicited and communicated with FFL's lead sources to refer prospective franchisees to use brands of Sequel.

113.  Defendants' breach of their duty of loyalty has caused and will continue to cause FFL to suffer damages, including, but not limited to, loss of franchisees and prospective franchisees, loss of goodwill with customers and lead sources and referral partners and reputational harm.

**COUNT THREE**
**BREACH OF FIDUCIARY DUTY**
**(As to Defendants)**

114.  FFL realleges, and incorporates by reference, the allegations of Paragraphs 1 through 113 as if fully set forth herein.

115.  Defendants were employed by FFL as Directors of Franchise Development until their employment ended on July 31, 2025.

116.  As Directors of Franchise Development, Defendants held a position of trust and authority. During the term of their employment with FFL, FFL entrusted them with its Confidential Information, including trade secrets.

117.   Due to the relationship of mutual confidence between FFL and Defendants, and Defendants' status as agents of FFL, Defendants owed FFL a fiduciary duty.

118.   Upon information and belief, Defendants breached their fiduciary duty to FFL by, while still employed by FFL, using its Confidential Information, including trade secrets, to solicit FFL's lead sources and clients and prospective clients on behalf of a competitor.

119.   Defendants' breach of their fiduciary duty has caused and will continue to cause FFL to suffer damages, including, but not limited to, loss of franchisees and prospective franchisees, loss of goodwill with customers and lead sources and referral partners and reputational harm.

<u>**COUNT FOUR**</u>
<u>**TORTIOUS INTERFERENCE WITH CONTRACT**</u>
**(As to Defendants)**

120.   FFL realleges, and incorporates by reference, the allegations of Paragraphs 1 through 119 as if fully set forth herein.

121.   The Agreements are enforceable contracts, and the restrictive covenants therein are also enforceable under Florida law.

122.   Defendants each knew about the existence of each other's respective Agreement with FFL.

123.   Defendants each tortiously and unjustifiably interfered with the

Agreements by encouraging, inducing, and proximately causing one another to breach the restrictive covenants within these Agreements, including by not devoting their full working time and efforts to FFL but instead working for Sequel, including soliciting FFL clients and lead sources, during and after their employment at FFL, by disparaging FFL to FFL's lead sources, referral partners, and franchisor clients, and by using and/or disclosing FFL's Confidential Information for their own benefit or the benefit of Sequel.

124.   Defendants had no competitive or economic privilege to interfere with the Agreements.

125.   As a direct and proximate result of Defendants' continued tortious interference with each other's respective Agreements, FFL has suffered and will continue to suffer irreparable injury that cannot be fully compensated by money damages.

126.   In addition to the irreparable harm described herein, FFL has a substantial likelihood of success on this claim; the harm to Defendants should preliminary injunctive relief be granted to restore the status quo ante would be far outweighed by the harm to FFL if no such relief were granted; and the public interest favors such relief. Balancing such factors, FFL is entitled to the remedy of a preliminary injunctive relief, as well as permanent injunctive relief as prayed for below.

127.   Although inadequate, FFL is still entitled to an award of damages against Defendants for their intentional interference with the Agreements, including, but not limited to, the costs of conducting an investigation into Defendants' conduct, the cost of taking corrective action, and damages to its reputation and resulting financial losses, such amounts to be determined at bench trial.

128.   Defendants' conduct was willful, justifying an award of exemplary and punitive damages.

## COUNT FIVE
## TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS
### (As to Defendants)

129.   FFL realleges, and incorporates by reference, the allegations of Paragraphs 1 through 128 as if fully set forth herein.

130.   At all material times, FFL had business relationships with existing and prospective clients seeking FFL's products and services, as well as FFL's lead sources and referral partners.

131.   FFL has invested significant time and resources in developing these relationships, and generating prospective franchise leads through these relationships with consultant networks makes up eighty-five to ninety percent of FFL's business.

132.   Defendants knew of FFL's business and contractual relationships with existing and prospective clients and lead sources and referral partners.

133.   Upon information and belief, while they were still employed at FFL,

Defendants tortiously interfered with these business and contractual relationships by, among other things, actively soliciting FFL's lead sources and referral partners in order to refer FFL's prospective franchisees to use Sequel brands instead.

134.   Defendants performed these actions for the benefit and competitive advantage of FFL's direct competitor, Sequel.

135.   As a direct and proximate result of Defendants' continued tortious interference with FFL's client, lead source and referral partner relationships, FFL has suffered and will continue to suffer irreparable injury that cannot be fully compensated by money damages.

136.   In addition to the irreparable harm described herein, FFL has a substantial likelihood of success on this claim; the harm to Defendants should preliminary injunctive relief be granted to restore the status quo ante would be far outweighed by the harm to FFL if no such relief were granted; and the public interest favors such relief. Balancing such factors, FFL is entitled to the remedy of a preliminary injunctive relief, as well as permanent injunctive relief as prayed for below.

137.   Although inadequate, FFL is still entitled to an award of damages against Defendants for their intentional interference with FFL's relationships with its clients, lead sources and referral partners, including, but not limited to, the costs of conducting an investigation into Defendants' conduct, the cost of taking

corrective action, and damages to its reputation and resulting financial losses, such amounts to be determined at bench trial.

138.   Defendants' conduct was willful, justifying an award of exemplary and punitive damages.

**COUNT SIX**
**VIOLATION OF THE DEFEND TRADE SECRETS ACT**
**(As to Defendants)**

139.   FFL realleges, and incorporates by reference, the allegations of Paragraphs 1 through 138 as if fully set forth herein.

140.   Under the Agreements, Defendants expressly agreed that they would not, at any time during or after their employment, use or disclose FFL's Confidential Information, including trade secrets, except as authorized by FFL in connection with their job duties and obligations. Even apart from these written contractual agreements, Defendants have a duty to refrain from using or disclosing FFL's trade secrets without FFL's permission.

141.   The Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836(b)(1), creates a private right of action for "[a]n owner of a trade secret that is misappropriated . . . if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce."

142.   Defendants misappropriated by improper means FFL's trade secrets, including its (a) the identity of FFL's clients and prospects; (b) the specifications,

terms and pricing of FFL's agreements with its brands, lead sources and referral partners; (c) business opportunities and targeted potential lead sources and referral partners and clients; (d) business strategies; and (e) intellectual property strategies.

143.    FFL was using these trade secrets connection with providing its products and services in interstate U.S. commerce, FFL took reasonable steps to maintain the secrecy of these trade secrets, and these trade secrets were not generally known or readily ascertainable by other persons who could obtain economic value from their disclosure or use.

144.    Among the efforts that FFL takes to protect its trade secrets include having its employees with access to such information sign confidentiality agreements, using password-protected computers and devices, requiring employees to return company property when they leave the company, requiring franchisor clients and brands to treat FFL's Confidential Information as confidential, and sending letters to all departing employees reminding them of their obligations to protect FFL's Confidential Information and return Company property.

145.    FFL was the owner of these trade secrets because it had the rightful title to the trade secrets, having developed and protected them as described above.

146.    Defendants misappropriated FFL's trade secrets by disclosing the trade secrets without express or implied consent, with knowledge at the time of disclosure that their knowledge of FFL's trade secrets was acquired under circumstances giving

rise to a duty to maintain its secrecy or limit its use. *See* 18 U.S.C. § 1839(5)(B)(ii)(II).

147.   Defendants used improper means to acquire knowledge of FFL's trade secrets because they acquired such knowledge by breaching their contractual obligations to maintain their secrecy and/or limit their use.

148.   Defendants knew or had reason to know that their knowledge of FFL's trade secrets was acquired under circumstances giving rise to a duty to maintain their secrecy or limit their use because they entered into the Agreements which explicitly provided for the protection of FFL's Confidential Information, including trade secrets.

149.   Notwithstanding this knowledge, upon information and belief, Defendants disclosed and/or used FFL's trade secrets immediately prior to and following their termination from FFL, without the express or implied consent of FFL.

150.   By using and disclosing FFL's trade secrets in connection with their employment with a direct competitor, Defendants have caused monetary and non-monetary damage to FFL.

151.   Specifically, upon information and belief, Defendants used and/or disclosed these trade secrets in connection with their employment with Sequel, both when they accessed certain files belonging to FFL while employed at FFL, and when

they accessed such files following their resignation, in order to induce FFL's clients and lead sources and referral partners to do business with Sequel.

152.    Defendants have been unjustly enriched by the information wrongfully obtained from FFL.

153.    Defendants' actions as described herein constitute misappropriation of FFL's trade secrets in violation of the federal Defend Trade Secrets Act, 18 U.S.C. § 1836.

154.    Defendants' post-termination actions, including their misappropriation of FFL's trade secrets, were willful and malicious, which entitles FFL to exemplary damages up to two (2) times the amount of damages awarded for the actual monetary losses suffered by FFL. *See* 18 U.S.C. § 1836(b)(3)(C).

155.    Defendants' post-termination actions, including their misappropriation of FFL's trade secrets, were willful and malicious, which entitles FFL to recover fees under 18 U.S.C.§ 1836(b)(3)(D).

156.    The aforementioned unlawful conduct of Defendants proximately caused damages to FFL. In addition to monetary damages, FFL has suffered and will continue to suffer immediate and irreparable harm to its business and goodwill with clients, lead sources and referral partners, for which it has no adequate remedy at law.

157.    By nature of Defendants continuing to possess FFL's Confidential

Information, including trade secrets, FFL is at risk of Defendants' continued use and disclosure of its trade secrets.

158.   There is substantial threat that FFL will suffer irreparable injury to its business and operations if the injunction is not granted enjoining Defendants from using the trade secrets taken from FFL or disclosing them to or with others.

159.   The harm to Defendants should preliminary injunctive relief be granted to restore the status quo ante would be far outweighed by the harm to FFL if no such relief were granted. Further, FFL has demonstrated that granting the injunction will not disserve the public interest. Indeed, the public interest supports the issuance of an injunction to protect FFL's Confidential Information, including trade secrets, during this litigation, and to prevent unlawful competition, misappropriation of trade secrets, and breaches of contract.

160.   A preliminary and permanent injunction enforcing the restrictive covenants in the Agreements and restraining and enjoining Defendants from further misappropriation, use or disclosure of FFL's trade secrets is therefore reasonably necessary to preserve the status quo and protect FFL's legal rights pending in this litigation.

## COUNT SEVEN
## VIOLATION OF THE FLORIDA UNIFORM TRADE SECRETS ACT
### (As to Defendants)

161.   FFL realleges, and incorporates by reference, the allegations of

Paragraphs 1 through 160 as if fully set forth herein.

162. Under the Agreements, Defendants expressly agreed that they would not, at any time during or after their employment, use or disclose FFL's Confidential Information, including trade secrets, except as authorized by FFL in connection with their job duties and obligations. Even apart from these written contractual agreements, Defendants have a duty to refrain from using or disclosing FFL's trade secrets without FFL's permission.

163. The Florida Uniform Trade Secrets Act ("FUTSA"), Fla. Stat. §§ 688.001-688.009, creates a private right of action for damages against misappropriation of trade secrets and authorizes courts to grant injunctive relief against "[a]ctual or threatened misappropriation."

164. Defendants misappropriated by improper means FFL's trade secrets, including its (a) the identity of FFL's clients and prospects; (b) the specifications, terms and pricing of FFL's agreements with its brands, lead sources and referral partners; (c) business opportunities and targeted potential lead sources and referral partners and clients; (d) business strategies; and (e) intellectual property strategies.

165. FFL was using these trade secrets connection with providing its products and services in interstate U.S. commerce, FFL took reasonable steps to maintain the secrecy of these trade secrets, and these trade secrets were not generally known or readily ascertainable by other persons who could obtain economic value

from their disclosure or use.

166.    Among the efforts that FFL takes to protect its trade secrets include having its employees with access to such information sign confidentiality agreements, using password-protected computers and devices, requiring employees to return company property when they leave the company, requiring franchisor clients and brands to treat FFL's Confidential Information as confidential, and sending letters to all departing employees reminding them of their obligations to protect FFL's Confidential Information and return Company property.

167.    FFL was the owner of these trade secrets because it had the rightful title to the trade secrets, having developed and protected them as described above.

168.    Defendants misappropriated FFL's trade secrets by disclosing the trade secrets without express or implied consent, with knowledge at the time of disclosure that their knowledge of FFL's trade secrets was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use. *See* Fla. Stat. § 688.002(2).

169.    Defendants used improper means to acquire knowledge of FFL's trade secrets because they acquired such knowledge by breaching their contractual obligations to maintain their secrecy and/or limit their use.

170.    Defendants knew or had reason to know that their knowledge of FFL's trade secrets was acquired under circumstances giving rise to a duty to maintain their secrecy or limit their use because they entered into the Agreements which explicitly

provided for the protection of FFL's Confidential Information, including trade secrets.

171. Notwithstanding this knowledge, upon information and belief, Defendants disclosed and/or used FFL's trade secrets immediately prior to and following the end of their employment with FFL, without the express or implied consent of FFL.

172. By using and disclosing FFL's trade secrets in connection with their employment with a direct competitor, Defendants have caused monetary and non-monetary damage to FFL.

173. Specifically, upon information and belief, Defendants used and/or disclosed these trade secrets in connection with their employment with Sequel, both when they accessed certain files belonging to FFL while employed at FFL, and when they accessed such files following their resignation, in order to induce FFL's clients and lead sources and referral partners to do business with Sequel.

174. Defendants have been unjustly enriched by the information wrongfully obtained from FFL.

175. Defendants' actions as described herein constitute misappropriation of FFL's trade secrets in violation of the Florida Uniform Trade Secrets Act, Fla. Stat. § 688.002.

176. Defendants' post-termination actions, including their misappropriation

of FFL's trade secrets, were willful and malicious, which entitles FFL to exemplary damages up to two (2) times the amount of damages awarded for the actual monetary losses suffered by FFL. *See* Fla. Stat. § 688.004.

177. Defendants' post-termination actions, including their misappropriation of FFL's trade secrets, were willful and malicious, and in bad faith, which entitles FFL to recover fees under Fla. Stat. § 688.005.

178. The aforementioned unlawful conduct of Defendants proximately caused damages to FFL. In addition to monetary damages, FFL has suffered and will continue to suffer immediate and irreparable harm to its business and goodwill with clients, lead sources and referral partners, for which it has no adequate remedy at law.

179. By nature of Defendants continuing to possess FFL's Confidential Information, including trade secrets, FFL is at risk of Defendants' continued use and disclosure of its trade secrets.

180. There is substantial threat that FFL will suffer irreparable injury to its business and operations if the injunction is not granted enjoining Defendants from using the trade secrets taken from FFL or disclosing them to or with others.

181. The harm to Defendants should preliminary injunctive relief be granted to restore the status quo ante would be far outweighed by the harm to FFL if no such relief were granted. Further, FFL has demonstrated that granting the injunction will

not disserve the public interest. Indeed, the public interest supports the issuance of an injunction to protect FFL's Confidential Information, including trade secrets, during this litigation, and to prevent unlawful competition, misappropriation of trade secrets, and breaches of contract.

182. A preliminary and permanent injunction enforcing the restrictive covenants in the Agreements and restraining and enjoining Defendants from further misappropriation, use or disclosure of FFL's trade secrets is therefore reasonably necessary to preserve the status quo and protect FFL's legal rights pending in this litigation.

**COUNT EIGHT**
**CONVERSION**
**(As to Defendants)**

183. FFL realleges, and incorporates by reference, the allegations of Paragraphs 1 through 182 as if fully set forth herein.

184. FFL owns confidential and proprietary information and documents, some of which containing trade secrets, that were stored electronically in its secured and password-protected computer systems.

185. Defendants intentionally accessed and took possession of FFL's property, denying FFL's benefit of ownership of that property, by taking copies of these documents without authorization and using them and/or disclosing them to Sequel.

186.    Upon information and belief, Defendants' improper access and/or taking of files and documents occurred both during and after Defendants' employment at FFL.

187.    As a direct and proximate result of Defendants' conduct, FFL has suffered and continues to suffer damages, including, but not limited to, the costs of conducting an investigation into Defendants' conduct, the cost of taking corrective action, and damages to its reputation and resulting financial losses, such amounts to be determined at bench trial.

188.    Defendants' conduct was willful, justifying an award of exemplary and punitive damages.

## COUNT NINE
## CIVIL CONSPIRACY
**(As to Defendants)**

189.    FFL realleges, and incorporates by reference, the allegations of Paragraphs 1 through 188 as if fully set forth herein.

190.    Defendants are conspiring with one another and with Sequel to breach the Agreements and unfairly compete with FFL as alleged herein.

191.    The agreement or scheme by Defendants as alleged herein constitutes a conspiracy to do an unlawful act, or a lawful act by unlawful means.

192.    Each Defendant was aware of the scheme, as well as Defendants' respective acts in furtherance of the scheme, and assisted in it.

193.    Defendants conspired together with the full knowledge of the Agreements with FFL.

194.    The acts by Defendants constitute acts in pursuance of the conspiracy with each other, including, but not limited to, the following acts: (1) Defendants planning and encouraging each other to join a direct competitor, Sequel, despite their non-compete agreements and "no other employment" agreements; (2) Defendants disparaging FFL's business to FFL's lead sources and referral partners so that such lead sources and referral partners would work directly with Sequel instead of with FFL; (3) Defendants using and/or disclosing FFL's Confidential Information without FFL's permission for their personal benefit and/or the benefit of Sequel; and (4) Weeter soliciting FFL's prospective franchisees in order to induce them to terminate their business relationship with FFL and to instead do business with Sequel.

195.    As a direct and proximate result of Defendants' continued conspiracy to breach the Agreements, FFL has suffered and will continue to suffer irreparable injury that cannot be fully compensated by monetary damages.

196.    Each Defendant is jointly and severally liable for all acts done in furtherance of the scheme.

WHEREFORE, Plaintiff respectfully requests that the Court:

A. Enter preliminary and permanent injunction enjoining and restraining

Defendants, and anyone acting in concert with them or on their behalf, from continuing to breach the provisions of their Agreements with FFL, including the non-compete, non-solicitation, non-disclosure and non-disparagement provisions, during the applicable restricted periods or during such period that the Court deems appropriate;

B. Award damages and interest to FFL for Defendants' breaches of the Agreements in an amount to be determined at bench trial;

C. Pursuant to the Agreements, award FFL's costs, including reasonable attorneys' fees, incurred by FFL in enforcing the Agreements; and

D. Grant FFL any other relief the Court deems just and proper.


Dated:        September 21, 2025         By: /s/ *John S. Gibbs III*

John S. Gibbs III
Florida Bar No. 91102
evan.gibbs@troutman.com
Moses Tincher
Georgia Bar No. 578906
(Special Admission forthcoming)
moses.tincher@troutman.com

TROUTMAN PEPPER
LOCKE LLP

600 Peachtree Street, NE
Suite 3000
Atlanta, GA 30308
Telephone: 404.885.3000

Attorneys for Plaintiff