## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**FRANCHISE FASTLANE, LLC**

      **Plaintiff,**

**v.**

**CANDICE WEETER and**
**RYAN LOGAN,**

      **Defendants.**

**Case No. 8:25-cv-02538-MSS-AAS**

---

### FRANCHISE FASTLANE, LLC'S
### MOTION FOR PRELIMINARY INJUNCTION
### WITH SUPPORTING MEMORANDUM OF LAW

Pursuant to Federal Rule of Civil Procedure 65 and this Court's Local Rules 6.01 and 6.02, Plaintiff Franchise Fastlane, LLC ("FFL" or "Plaintiff") hereby files its Motion for a Preliminary Injunction ("Motion") against Defendants Candice Weeter (f/k/a "Candice Milton") ("Weeter") and Ryan Logan ("Logan") (collectively, "Defendants"), and respectfully requests that this Court enter the Proposed Order attached hereto barring Defendants from further violations of an agreement they entered into with FFL.

In support of this Motion, FFL relies on its Supporting Memorandum of Law (set forth below) and the Declarations and other exhibits filed contemporaneously with this Motion. For the reasons set forth below, FFL respectfully requests that the Court grant this Motion.

## I.   <u>INTRODUCTION</u>

This case is a textbook example of why courts enforce restrictive covenants: two trusted former employees of FFL brazenly resigned in a public, defamatory spectacle to join a direct competitor, Sequel Brands, LLC ("Sequel"), and immediately began violating their contractual obligations to FFL. Even worse, Defendants did not merely breach their non-disclosure, non-disparagement, non-competition, and non-solicitation obligations; they also ostensibly stole FFL's trade secrets and confidential information, *while they were still employed by FFL and thereafter*, to unfairly tilt the competitive playing field in Sequel's favor. Their actions have irreparably harmed, and continue to irreparably harm, FFL's hard-earned goodwill, customer and business relationships, and competitive position in the marketplace.

FFL's business model relies heavily on the mutual trust of its lead sources, referral partners and franchisor clients, who provide valuable prospective franchisee leads. These leads are safeguarded by contractual agreements, ensuring that FFL acts as a representative and agent, adhering strictly to the terms, such that if a lead source or referral partner sends a lead to FFL to introduce it to an FFL brand, FFL cannot introduce that lead to any other brand without that lead source/referral partner's permission since the lead is owned by the lead source/referral partner. Breaching these agreements would jeopardize FFL's ability to receive future leads. Evidence indicates that Defendants have unlawfully appropriated this proprietary lead information, attempting to divert business to Sequel, and Weeter has already succeeded in soliciting at least one of FFL's prospective franchisees.

- 2 -

The urgency for injunctive relief is genuine and pressing. Defendants' continued misconduct cannot be remedied by monetary damages alone, and only swift intervention by this Court can prevent further injury to FFL's legitimate business interests. Thus, FFL respectfully requests that the Court grant this Motion.

## II.    FACTUAL BACKGROUND

### A. FFL's Business and Confidential Information

FFL is a leading franchise sales organization specializing in outsourced franchise development, sales, and marketing services for franchisors. (*See* Declaration of Tim Koch ("Koch Decl."), ¶ 4 (attached as **Exhibit 1**).) FFL partners with both emerging and established franchisors, managing the franchisee sales lifecycle—from initial leads and prospect qualification to deal closure. (*Id.*) FFL's selective approach has enabled it to expand across thousands of communities nationwide. (*Id.* ¶ 6.)

Some of the franchise brands that FFL sells to prospective franchisees include bodenvy and Exercise Coach. (*Id.* ¶ 4.) FFL has developed and maintained, at significant expense, valuable and long-standing working relationships and substantial goodwill with its client's franchisees and prospective franchisees. (*Id.* ¶ 5.) FFL also relies heavily on cultivating and maintaining strong business relationships with its lead sources and referral partners, which are essential to its success in sourcing prospective franchisees. (*Id.* ¶ 6.) FFL has also invested millions of dollars over the years in building its employee relationships and reputations with its lead sources and referral partners. (*Id.*) Generating prospective franchise leads through its relationships with its

consultant networks is eighty-five to ninety percent of FFL's business. (*Id.* ¶ 7.)

FFL strategically provides its key employees, including Defendants, with substantial training and unique knowledge and access to FFL's confidential information and materials. (*Id.* ¶ 8.) This includes FFL's trade secrets, such as pricing and sales strategies, financial data, marketing plans, franchisor/client lists, franchisee lists, prospective franchisee lists, operational procedures, and other information designated as confidential either expressly or by the circumstances in which it was provided (collectively, "Confidential Information"). (*Id.*) FFL's success depends on the confidentiality of its information, as well as the loyalty and integrity of its employees to not misuse it or otherwise violate their contractual obligations. (*Id.* ¶ 9.)

FFL developed the Confidential Information at significant expense and effort, as it is not generally available to the public and FFL derives economic value from its Confidential Information. (*Id.* ¶ 10.) Because the Confidential Information is critical to FFL's position in its industry, FFL takes reasonable efforts to maintain its confidentiality, including having its employees with access to such information sign confidentiality agreements, using password-protected computers and devices, requiring employees to return company property when they leave the company, requiring franchisor clients and brands to treat FFL's Confidential Information as confidential, and sending letters to departing employees reminding of their obligations to protect FFL's Confidential Information and return Company property. (*Id.* ¶ 11.)

### B. Defendants' Employment with FFL

Defendants Weeter and Logan were employed by FFL as Directors of

- 4 -

Franchise Development beginning in June and July 2022, respectively. (*Id.* ¶¶ 12-13.) During their tenure, Defendants engaged in sales efforts on behalf of FFL, including developing and maintaining direct and continuous relationships with franchisor clients, lead sources and referral partners. (*Id.* ¶¶ 14-15.) Their duties were without regard to geographic scope, including maintaining relationships with franchisor clients, lead sources and referral partners based across the U.S. with a need for FFL's services  (*Id.* ¶ 14.) As a result of their employment with FFL, Defendants developed a significant number of contacts and relationships with FFL's franchisor clients, franchisees and prospective franchisees, lead sources and referral partners. (*Id.* ¶ 15.)

In or about July of 2025, upon information and belief, Defendants either approached or were approached by former FFL employee, Jennifer Cain ("Cain"), a current employee of Sequel. (*Id.* ¶ 16.) Cain actively solicited Weeter and Logan to resign from FFL and accept employment with Sequel, a direct competitor of FFL that launches and manages fitness and wellness franchises. (*Id.* ¶¶ 16-17.)

On July 17, 2025, while still employed at FFL, Defendants attended a networking event for business-related purposes. (*Id.* ¶ 18.) An important part of the event was a dinner networking boat cruise with the FranChoice Consultant Network ("FranChoice"), FFL's top lead source and referral partner. (*Id.*) Approximately one hundred FranChoice consultants attended the event, as well as many of FFL's franchisor clients and members of FFL's development team. (*Id.*) During the cruise, Defendants made a public statement to the attendees—including FFL's franchisor clients, lead sources, referral partners, competitors, and co-workers—that they

intended to resign from FFL due to the "systemic toxic culture" at FFL and that FFL is having "issues," false, disparaging and defamatory statements intended to injure FFL. (*Id.* ¶¶ 19-20.) These false and defamatory statements led to significant concern among the attendees, prompting them to question the stability of FFL. (*Id.* ¶ 20.) FFL was forced to expend considerable time and effort to reassure and retain employees who were exposed to these statements. (*Id.* ¶ 21.) Defendants' last day of employment with FFL was July 31, 2025. (*Id.* ¶ 23.) Following the cruise, FFL leadership had to spend weeks mitigating the impact with FFL's franchisor clients, lead sources, and referral partners, which created a huge distraction from FFL's business. (*Id.* ¶ 22.)

### C. Terms of the Agreements

As a condition of their employment and access to FFL's Confidential Information, the Defendants executed Proprietary Matters Agreements ("the Agreements"), thereby agreeing to comply with certain restrictive covenants both during and following their termination of employment with FFL, including non-competition, non-disclosure, non-solicitation, and non-disparagement provisions. (*Id.* ¶¶ 25-26, Exs. A-B, § 1, 4–6.) Specifically, as relevant here, Section 5 of the Agreements entitled "Noncompetition" provides in pertinent part that for a period of eighteen (18) months following the termination of employment, Defendants shall not, directly or indirectly, "be involved as … employee, agent, independent contractor, or otherwise, of any entity or business that competes with [FFL] or any of its affiliates, including, but not limited to . . . any entity or business that provides products or services [that] [FFL] or any of its affiliates was developing during [their] employment with Company or any

of its affiliates." (*Id.* ¶ 27, Exs. A-B, § 5.)

The absence of a specific geographic restriction is construed as a national geographic restriction covering the territories in which FFL operates to protect the use of FFL's Confidential Information, including franchisor client, franchisee and prospective franchisee and lead source and referral partner information, by direct competitors in a highly specialized and competitive market given the national reach of FFL's franchise-based business with services that are electronic in nature and the fact that FFL does not assign Directors of Franchise Development to contact clients, lead sources and referral partners solely in one geographic area or region. (*Id.* ¶ 28.)

The Agreements also include a non-disclosure provision in Section 1 entitled "Nondisclosure of Confidential Information" in which Defendants expressly agreed that "during and after [their] employment with [the] Company," they "shall not directly or indirectly disclose to any person or entity or use for any purpose or permit the exploitation, copying, or summarizing of any Confidential Information [as defined in the Agreements], except as specifically required in the proper performance of [Defendants'] duties for [the] Company. (*Id.* ¶ 29, Exs. A-B, § 1(c).)

The non-solicitation provision in Section 4 entitled "Nonsolicitation of Employees, Vendors, Referral Sources and Customers" provides in relevant part that for a period of eighteen (18) months following the termination of their employment, Defendants will not, directly or indirectly, interfere or redirect with FFL's business relationships. (*Id.* ¶ 30, Exs. A-B, § 4.) Further, under Section 6, entitled, "Non-Disparagement," Defendants agreed that, while employed by FFL and thereafter that

they would not disparage or defame FFL. (*Id.* ¶ 31, Exs. A-B, § 6.)

The Agreements are governed by Florida law and supported by FFL's legitimate business interests in its Confidential Information, business relationships, and reputation and goodwill. (*Id.* ¶¶ 32-33, Exs. A-B, § 15(b).) Defendants agreed that any breach of the terms of the Agreements "will result in irreparable and continuing damage to [FFL] for which there may not be an adequate remedy at law," and that FFL "shall also be entitled to equitable relief (without the necessity of proving the inadequacy of monetary damages or the posting of any bond or security), including such injunctive relief as may be necessary to protect the interests of [FFL]." (*Id.* ¶ 34, Exs. A-B, § 11.)

### D. Defendants Appear to Steal FFL's Trade Secrets.

After forensically examining Defendants' FFL-issued laptops, FFL has learned that in the days leading up to their departure—and even **after** their employment ended—Defendants accessed numerous documents on their FFL-issued work laptops and through their respective OneDrive accounts, and there also is extensive evidence that Defendants stole these materials. (*See* Declaration of Stephen Simmons ("Simmons Decl."), ¶ 7 (attached hereto as **Exhibit 2**); Koch Decl. ¶ 35.) These files contain FFL's Confidential Information, including trade secrets. (Koch Decl. ¶ 35.)

With respect to Logan's theft, the forensic evidence shows that he most likely took FFL's materials by uploading files to his Google Drive and/or Sequel accounts from his FFL laptop.[1] (Simmons Decl. ¶ 8.) Between the dates of July 28 and August

---

[1] FFL is unable to confirm what materials Logan took via his Google Drive and/or Sequel accounts without having access to those accounts. Current forensic software is unable to identify whether files

4, Logan accessed Google Drive (a site into which one can easily drag and drop files from a laptop) dozens of times, including at least 20 times *after* he resigned from FFL. (*Id.* ¶ 8.) Logan also began accessing his Sequel HubSpot[2] and Zoom accounts on his FFL laptop while still employed by FFL, and he continued accessing those accounts extensively from his FFL laptop after resigning. (*Id.*)

Further, between July 27 and August 1, Logan's Internet Explorer web history on his FFL laptop shows dozens of file downloads and access to certain FFL OneDrive files. (*Id.* ¶ 10.) Tellingly, Logan also tried logging into his FFL Office 365 account three separate times after he resigned; his credentials, however, had been deactivated and his attempts were unsuccessful. (*Id.* ¶ 11.) Making matters worse, based on Logan's activity on FFL's HubSpot, Logan, in the weeks leading up to his departure, made numerous "intro calls." (*Id.* ¶ 12.) From the names of the recipients of these HubSpot calls, it appears that Logan made these calls to prospective franchisees and lead sources and referral partners to compete against FFL. (Koch Decl. ¶ 37.)

Weeter engaged in similar activity. She accessed dozens of files leading up to her departure (inconsistent with her activities for FFL), and she also used her Sequel email account while still employed at FFL. (Koch Decl. ¶ 38.) Indeed, it appears she

are loaded into such accounts. Rather, forensic software can only identify what files were accessed or modified and when on a laptop, and whether and when cloud-based storage accounts are accessed via the laptop. The forensic software cannot identify what files are in or moved into a Google Drive or other web- or cloud-based application without access to the specific accounts. (Simmons Decl. ¶ 9.)

[2] HubSpot is a customer relationship management (CRM) platform which contains numerous categories of customer data, such as contact information, order histories, customer preferences, and many other non-public customer details. (Koch Decl. ¶ 36.) It is used for inbound marketing, sales, and customer service. (*Id.*)

used that Sequel email to log into her Sequel HubSpot account as early as July 28, 2025, and her HubSpot activity level increased between July 27 and July 29. (Simmons Decl. ¶ 13.) Further, on July 28, 2025, Weeter received an email from a FranChoice consultant intended to introduce her to a prospective franchisee. (Koch Decl. ¶ 39.) This email was sent to both her FFL and Sequel work email accounts. (*Id.*, **Ex. C**.) Notably, after this initial email, no further communication occurred via her FFL account, indicating that it is likely these discussions continued via her Sequel account in order to attract the prospective franchisee. (*Id.*)

There also was a high number of interactions—49, to be exact—between Weeter's FFL laptop and Sync.com (a cloud service site that provides the ability to sync locally stored documents to a Sync storage site account) on August 11, well after Weeter's employment ended with FFL. (Simmons Decl. ¶ 14.) Sync.com could have easily been used to upload FLL files to Weeter's account. (*Id.* ¶ 15.) Indeed, on the same day that this Sync.com activity occurred (August 11), Weeter also accessed 38 FFL documents, strongly suggesting the events were connected and that she uploaded some or all of the accessed documents to a Sync.com account. (*Id.* ¶¶ 16-17.)

One document that Weeter accessed, both during and after her employment at FFL, is entitled "Canopy Franchise Fee_Commission Structure.xlsx," which is a spreadsheet containing FFL's highly confidential pricing structure. (Koch Decl. ¶ 40.) If a competitor had this, they would know what FFL charges in commissions for its brands. (*Id.* ¶ 41.) Leading up to her last day of employment, Weeter also accessed a spreadsheet titled "Call Log.xlsx," which contains a partial list of FFL's prospective

franchisees and the markets in which they live or are interested. (*Id.* ¶ 42.) Weeter accessed this document for the sole purpose of competing against FFL as her job duties at FFL did not at the time require her to access or use such document. (*Id.*) Indeed, a competitor having access to such document could use it to solicit business from these prospective franchisees to compete for brands that FFL may offer. (*Id.* ¶ 43.)

Additionally, in the days leading up to their last day of employment and thereafter, Defendants continued to access FFL's confidential information and trade secrets, including Consultant and Candidate presentations for six different brands, Unit Economic Workbooks for eight different brands, and 2 Minute Drills for two different brands, Presentation Notes for two different brands, brand approval letters, and Confirmation Day Agendas. (*Id.* ¶ 44.) These documents contain highly confidential information and trade secrets, as they contain marketing strategies in terms of how FFL positions a particular brand to its lead sources, referral partners and prospective franchisees in an effort to ultimately sell franchises for that brand. (*Id.* ¶¶ 44-45.) Notably, two of the brands Defendants accessed and likely stole are in the health and wellness space and could be used by Sequel to position their brands more favorably and further compete with FFL brands. (*Id.* ¶ 47.) Further, Weeter worked with only two of FFL's brands prior to her resignation; therefore, there was no legitimate business reason for her to access information or documents relating to the other brands. (*Id.* ¶ 48.)

**E. Defendants' Continued Violations of the Agreements**

Upon information and belief, while still employed at FFL, Defendants actively

solicited FFL's lead sources and referral partners in order to refer FFL's prospective franchisees to use Sequel brands instead. (*Id.* ¶ 49.) Further, Defendants are currently employed at Sequel in roles similar to those they held at FFL. (*Id.* ¶ 24.) That is, they are soliciting prospective franchisees for Sequel, diverting them from considering FFL's clients, both within and outside the wellness sector. (*Id.* ¶ 50.) Additionally, they are engaging with the same lead sources and referral partners as FFL across the United States. This overlap poses a significant competitive threat to FFL, as both companies share lead sourcing strategies, including attending multiple consultant network events to promote their brands and build relationships with franchise consultants. (*Id.* ¶ 51.) Lead sources often direct franchisees to unrelated brands, with franchisees typically choosing only one. (*Id.*) Thus, if a lead source refers a prospect to a Sequel brand, it is unlikely they will consider FFL's clients. (*Id.*)

Sequel's ownership of franchisor brands similar to FFL's also creates a competitive environment that heavily influences prospective franchisees' decisions. (*Id.* ¶ 52.) These franchisees often prioritize franchisors offering diverse brands across industries, rather than specific brands. (*Id.*) For example, FFL's client, The Exercise Coach, and Sequel's Body20 both offer tech-driven, personalized training sessions, including 20-minute workouts. (*Id.* ¶ 53.) This competition impacts franchisee choices, which affects FFL's market share and growth. (*Id.* ¶ 54.)

Weeter is maintaining direct communication with FFL's lead sources and

referral partners, and solicited two prospective franchisees, John Does,[3] in July or August 2025 to engage with Sequel instead of FFL. (*Id.* ¶ 55.) Prior to Weeter's solicitation, John Doe 1 was planning to invest $110,500 in two bodenvy franchise units, from which FFL stood to earn $43,400 and a 1% revenue stream over 10 years. (*Id.* ¶ 56.) Following Weeter's intervention, John Doe 1 has not purchased a bodenvy franchise and likely chose Sequel's franchise, directly harming FFL. (*Id.* ¶ 57.)

Defendants' actions to date have caused and threaten to continue causing irreparable harm to FFL, including the loss of business opportunities, damage to client, lead source, referral partner, and employee relationships, and harm to FFL's reputation and goodwill. (*Id.* ¶ 58.) Monetary damages alone are inadequate to remedy these ongoing and future injuries. (*Id.* ¶ 59.) Accordingly, FFL seeks immediate injunctive relief to prevent Defendants from further violating their contractual obligations and to protect FFL's legitimate business interests. (*Id.* ¶ 60.)

## III.   LEGAL ARGUMENTS

### I.   Applicable Standard

The purpose of a preliminary injunction is to "preserve the status quo until the merits of the controversy can be fully and fairly adjudicated." *Robinson v. Attorney General*, 957 F.3d 1171, 1178–79 (11th Cir. 2020). A court need not find evidence that positively guarantees a final verdict in plaintiff's favor. *See Levi Strauss & Co. v. Sunrise Intern. Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995). Rather, the Court should enter

---

[3] FFL has redacted the names of its prospective franchisees in order to protect their privacy interests. Upon request, FFL will send an unredacted version to the Court under seal.

a preliminary injunction when the movant shows: (1) there is a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered if the injunctive relief is not granted; (3) that the threatened injury to the moving party outweighs whatever damage might cause the non-moving party if the injunctive relief is granted; and (4) that granting the injunctive relief sought serves the public interest. *Jysk Bed'N Linen v. Dutta-Roy*, 810 F.3d 767, 774 (11th Cir. 2015). FFL satifies all four elements.

## II.    FFL Is Likely to Succeed on the Merits of Its Claims.

The first element—substantial likelihood of success on the merits—"is generally the most important." *CiCi Enter., LP v. Four Word Motion, LLC*, No.6:16-cv-1679-Orl-41KRS, 2016 WL 9244626, at *3 (M.D. Fla. Oct. 17, 2016). "A substantial likelihood of success on the merits requires a showing of only likely or probable, rather than certain, success." *Id.* Further, while a plaintiff "need only establish a substantial likelihood of success on one claim," *Boggs Contracting, Inc. v. Freismuth*, No. 6:21-CV-2088-CEM-EJK, 2021 WL 6755466, at *2 (M.D. Fla. Dec. 27, 2021), FFL has established a likelihood of success on all of its claims that are related to the alleged ongoing harm warranting injunctive relief.[4]

### A. FFL is likely to succeed on its breach of contract claim.

Florida law applies in evaluating FFL's breach of contract claim. Koch Decl. ¶ 32, Exs. A-B, § 15(b). "For a breach of contract claim, Florida law requires the plaintiff to plead and establish: (1) the existence of a contract; (2) a material breach of

---

[4] For purposes of this request for preliminary injunction, FFL has raised only the claims that are related to the injunctive relief sought.

that contract; and (3) damages resulting from the breach." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2009). "When a breach-of-contract action is based upon enforcement of a restrictive covenant, however, the plaintiff must plead and prove additional elements in order to establish that the restrictive covenant is a valid restraint of trade." *Rauch, Weaver, Norfleet, Kurtz & Co., Inc. v. AJP Pine Island Warehouses, Inc.*, 313 So. 3d 625, 630 (Fla. 4th DCA 2021).

A restrictive covenant is valid and enforceable if the movant "simply plead[s] and prove[s] the existence of one or more legitimate business interests justifying the restrictive covenant." *USI Ins. Servs. of Florida, Inc. v. Pettineo*, 987 So. 2d 763, 766 (Fla. 4th DCA 2008) (quoting Fla. Stat. § 542.335(1)(b)). Indeed, Florida has a "long-established precedent of protecting legitimate business interests." *Spine v. Moulton*, 346 So. 3d 154, 158 (Fla. 2d DCA 2022). Moreover, a restrictive covenant must be "reasonable in time, area, and line of business." *See* Fla. Stat. § 542.335(1)(a).

a) ***The restrictive covenants are supported by legitimate business interests.***

Here, FFL's legitimate business interests that support the Agreements include the protection of FFL's: (a) valuable, confidential business information, including FFL's business strategies, financial data, marketing plans, franchisor/client lists, franchisee lists, prospective franchisee lists, lead source and referral partner information, and operational procedures; (b) substantial relationships with existing and prospective customers and lead sources and referral partners; (c) trade secrets, including specialized training and pricing and sales strategies; and (d) reputation and customer and lead source and referral partner goodwill—all of which are currently at

- 15 -

risk, and continue to be at risk, as a result of Defendants' employment with FFL's competitor, inducing FFL's lead sources and referral partners to solicit prospective franchisees for Sequel Brands franchises rather than FFL's clients, solicitation of FFL's prospective franchisees, and disparagement of FFL. *See* Fla. Stat. § 542.335(1)(b) (providing examples of what constitutes a "legitimate business interest"); *see White v. Mederi Caretenders Visiting Servs. of Southeast Florida, LLC*, 226 So. 3d 774, 786 (Fla. 2017) (concluding that "**referral sources may be a protected legitimate business interest within the meaning of section 542.335**") (emphasis added).

The need for injunctive relief in this case is particularly compelling given that Sequel is in a line of business that shares the same lead sources and referral partners for prospective franchisees as well as lead sourcing strategies in the same geographic areas. Indeed, Defendants' use of the same lead sources and referral partners on behalf of Sequel as they did when they worked for FFL has resulted and will continue to result in FFL being denied the opportunity to sell their clients' brands to prospective franchisees referred by these lead sources and referral partners.

As already demonstrated by Weeter's actions to date, Defendants' extensive knowledge of FFL's pricing and sales strategies and list of clients, franchisees, and prospects, as well as lead source and referral partner information, have allowed them to strategically target certain lead sources and referral partners to identify and attract prospective franchisees to purchase franchise units from Sequel, rather than from FFL's franchisor clients. Further, this affects not only FFL's clients' brands in the fitness and wellness industry, but also impacts FFL's clients across brands. For

example, prospective franchisee John Doe 1 was planning to invest in FFL's bodenvy franchise units, but following Weeter's intervention, John Doe 1 ceased all communication with FFL and likely chose Sequel's franchise brand instead. Thus, the restrictive covenants must be enforced as they reasonably protect FFL's legitimate business interests by prohibiting Defendants from engaging with a similar line of business to FFL "that provides [similar] products or services" of FFL and from causing or attempting to cause, any of FFL's lead sources and referral partners to curtail, sever or alter its relationship or business with FFL. (Koch Decl. ¶ 27, Exs. A-B, § 5.)

### b) *The restrictive covenants are reasonable, and, thus, enforceable.*

Defendants entered into the Agreements with FFL in connection with and in consideration for their employment at FFL, which Agreements contained enforceable restrictive covenants, including non-compete, non-disclosure, non-solicitation, and non-disparagement provisions.[5] Defendants violated such provisions by stealing FFL's trade secrets, using and/or disclosing FFL's Confidential Information both during and after their employment at FFL, disparaging FFL, and working for FFL's direct competitor, Sequel, inducing FFL's lead sources and referral partners to identify and attract prospective franchisees to purchase franchise units from Sequel, rather than from FFL's franchisor clients, and by Weeter soliciting FFL's prospective franchisees.

---

[5] Courts have treated non-disparagement provisions as restrictive covenants evaluated under Fla. Stat. § 542.335. *See O'Neal v. Am. Shaman Franchise Sys., LLC*, 8:20-CV-936-KKM-AAS, 2022 WL 20478216, at *7 (M.D. Fla. May 23, 2022) (assuming without deciding the non-disparagement clause in the contract at issue was a restrictive covenant); *see also Head Kandy v. McNeil*, 2023 WL 6309985, at *2, *16 & n.13 (S.D. Fla. Sept. 12, 2023) (recognizing non-disparagement provision as a restrictive covenant under section 542.335 and finding breach supported a finding of irreparable harm).

The non-compete and non-solicit provisions at issue also are reasonable in time and geographic area.[6] The duration of the non-compete and non-solicit provisions (18 months following termination of employment with FFL) has consistently been found enforceable by Florida courts. *See, e.g.*, *Sarasota Beverage Co. v. Johnson*, 551 So. 2d 503, 507 (Fla. 2d DCA 1989) (finding 18-month reasonable, since it "ensures that a former employee cannot impart this confidential information to a competitor while it is still relevant"). The 18-month restraint should be enforced from the date the injunction is issued. *See Univ. Med. Clinics, Inc. v. Quality Health Plans, Inc.*, 51 So. 3d 1191, 1195 (Fla. 4th DCA 2011) (noting "court's discretion to run the injunction from the period of entry of the injunction rather than from termination of the agreement.").

Similarly, the geographic area of the non-compete and non-solicit provisions is appropriate. *See, e.g.*, *Marshall v. Gore*, 506 So. 2d 91 (Fla. 2d DCA 1987) (finding reasonable a nationwide geographic restriction where plaintiff sold software in several states); *Carnahan v. Alexander Proudfoot Co. World Headquarters*, 581 So. 2d 184, 186 (Fla. 4th DCA 1991) (recognizing that non-compete agreement may extend to former employer's entire geographic market); *Hayes Med. Staffing, LLC v. Eichelberg*, No. 23-cv-60748-GAYLES, 2024 WL 670440, at *9 (S.D. Fla. Jan. 23, 2024) ("the non-

---

[6] While the non-disclosure and non-disparagement provisions do not have a duration, Defendants expressly acknowledged in the Agreements that such restrictions are "both necessary and reasonable to protect the legitimate business interests of [FFL]." Exs. A-B, § 7(b); *see also McNeil*, 2023 WL 6309985, at *8 (noting non-disparagement provision with endless duration as reasonable where defendant agreed to the reasonableness of the restrictive covenants in the agreement). Further, to the extent this Court finds the unlimited duration to be unreasonable, this Court should modify the duration rather than finding the covenant unenforceable. *See United Subcontractors, Inc. v. Godwin*, No. 11-81329-CIV, 2012 WL 1593173, at *10 (S.D. Fla. Feb. 3, 2012).

competition covenant is reasonable … in area (within the United States) because Hayes has relationships with clients in all states, and it places physicians nationwide"); *Proudfoot Consulting Co. v. Gordon*, 576 F.3d 1223, 1238 (11th Cir. 2009) ("North America and Europe would be a reasonable geographic area because Proudfoot conducts its operations in that territory and Gordon was assigned to that territory").

Here, FFL and Sequel are web-based businesses that operate in a highly competitive market in similar locations throughout the United States. As discussed, both companies utilize the same lead sources and referral partners to identify and attract prospective franchisees, such that if a lead source or referral partner refers a prospective franchisee to Sequel instead of FFL, FFL's brands lose out on critical opportunities for growth and expansion. Further, during their employment at FFL, Defendants' duties were not limited in geographic scope. FFL did not assign Defendants to contact customers, prospects and lead sources and referral partners solely in one geographic area or region; instead, Defendants maintained relationships with such individuals across the United States. Significantly, through those long-standing relationships, Defendants had direct access to and became intimately familiar with FFL's confidential customer, prospect, and lead source and referral partner information, as well as pricing and sales strategies. Thus, the geographical restriction is reasonable in area and necessary to protect FFL's legitimate business interests.

c) *Defendants cannot rebut the reasonableness of the restrictive covenants.*

The burden of rebutting the reasonableness is solely on Defendants. Fla. Stat. § 542.335(1)(c); *Orkin Exterminating Co. v. Martin*, 516 So. 2d 970 (Fla. 3d DCA 1987).

Even assuming the restrictions are unreasonable in scope or duration, Florida law requires this Court to modify them to protect FFL's legitimate business interests. Fla. Stat. § 542.335(1)(c) (noting a "court *shall* modify the restraint and grant only the relief reasonably necessary to protect such interest or interests.") (emphasis added).

Given FFL's highly specialized area of business, its extensive confidential and proprietary information, its national reach, the close proximity of Sequel's business operations relative to those of FFL, and the fact that Defendants' current positions at Sequel, upon information and belief, are fully remote, the restrictive covenants are justified. Thus, no modification is necessary, and FFL is likely to succeed on its breach of contract claim. *See NationsBenefits, LLC v. Brady*, 2025 WL 2324753, at *4 (S.D. Fla. Aug. 7, 2025), *R&R adopted by* 2025 WL 2349014 (S.D. Fla. Aug. 13, 2025) (finding substantial likelihood of success where Defendants used client information and their ability to contact those clients to set up a competitive entity).

**B. FFL is likely to succeed on its tortious interference claim.**

Defendants also have tortiously interfered with FFL's business relationships with its clients, prospective franchisees, lead sources and referral partners. Under Florida law, "a tortious interference claim consists of the following elements: (1) the existence of a business relationship between the plaintiff and a third party; (2) the defendant's knowledge of the relationship; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of defendant's breach of the relationship." *Fortun Ins., LLC v. Rouco*, No. 25-cv-20760-JB, 2025 WL 936707, at *6 (S.D. Fla. Mar. 25, 2025).

- 20 -

The evidence shows that Defendants knew of FFL's business relationships with clients, lead sources and referral partners and prospects by virtue of being FFL's employees, and that through those relationships, Defendants solicited lead sources and referral partners to direct prospective franchisees to do business with Sequel instead of FFL. Indeed, the forensics show that while still employed at FFL, Logan used his FFL-issued laptop to access Sequel's computer and email systems and made numerous "intro calls." Additionally, Weeter was already working for Sequel with an active Sequel work email account used to communicate with FFL's lead source and referral partner to solicit a prospective franchisee for Sequel while still employed with FFL. Further, the evidence shows that Weeter successfully solicited prospective franchisee John Doe 1, who was in the process of investing in FFL's bodenvy franchise units, but that following her intervention, John Doe 1 ceased all communication with FFL, causing damages. Thus, FFL will likely succeed on its tortious interference claim. *See Fortun*, 2025 WL 936707, at *8 (finding likelihood of success on tortious interference claim where defendants solicited clients to move their business to a competitor).

### C. FFL is likely to succeed on its trade secret misappropriation claims.

Defendants also violated the Defend Trade Secrets Act ("DTSA") and Florida Uniform Trade Secrets Act ("FUTSA"). To prevail on a DTSA claim, a plaintiff must show that it owns a trade secret that relates to a product or service used in, or intended for use in, interstate commerce, and that a defendant misappropriated it. *Id.* at *6. The FUTSA elements are essentially the same: "[Plaintiff] 'must demonstrate that (1) it possessed a trade secret and (2) the secret was misappropriated.'" *Compulife Software,*

*Inc. v. Newman*, 959 F.3d 1288, 1310 (11th Cir. 2020).

As discussed, FFL has developed and maintained the following information, to which Defendants had access: FFL's business strategies, including pricing and sales strategies, financial data, marketing plans, franchisor/client lists, franchisee lists, prospective franchisee lists, and lead source/referral partner information. *See Fortun*, 2025 WL 936707, at *8 (finding similar list of information to be protectable trade secrets pleaded with particularity). Further, the evidence shows that Defendants improperly and unlawfully stole FFL's Confidential Information through various methods—e.g., uploading files to Google Drive, Sync.com and/or Sequel accounts from FFL laptops. Moreover, leading up to her last day of employment, Weeter accessed two highly confidential documents—"Canopy Franchise Fee_Commission Structure.xlsx," a spreadsheet containing FFL's highly confidential pricing structure, and "Call Log.xlsx," a spreadsheet containing a partial list of FFL's prospective franchisees. Defendants also accessed, and continued to access following their employment, other confidential and proprietary information, including, but not limited to, brand presentations, Unit Economic Workbooks, brand 2 Minute Drills, brand approval letters, and Confirmation Day Agendas. Given that their job duties and responsibilities did not require them at the time to access many of these files and documents, Defendants clearly intended to use such information in connection with their employment at Sequel. *See Fortun*, 2025 WL 936707, at *8.

Further, FFL has showed an intent to keep the above-referenced information secret by having its employees sign confidentiality agreements, using password-

protected computers and devices, requiring employees to return company property when they leave the company, and requiring franchisor clients and brands to treat such information as confidential. Moreover, the documents that Defendants accessed and used relate to FFL's business that operates in interstate commerce. Accordingly, FFL has shown a substantial likelihood of success on its DTSA/FUTSA claims.

### III. Defendants' Violations of the Agreements Give Rise to a Presumption of Irreparable Injury, FFL Has Already Suffered Irreparable Injury, and There Is No Adequate Remedy at Law for FFL.

Florida law presumes irreparable injury when, as here, former employees violate enforceable restrictive covenants. *See* Fla Stat. § 542.335(1)(j); *see JonJuan Salon, Inc. v. Acosta*, 992 So. 2d 1081, 1084 (Fla. 4th DCA 2006); *TransUnion Risk & Alt. Data Sols., Inc. v. MacLachlan*, 625 F. App'x 403, 406 (11th Cir. 2015) ("[A] presumption of irreparable harm...is the logical consequence of the movant's prima facie showing, including its establishment of the covenant's reasonableness in protecting legitimate business interests at stake.");*Veterinary Orthopedic Implants, Inc. v. Haas*, No. 3:20-cv-868-J-34MCR, 2020 WL 5369087, at *48–49 (M.D. Fla. Sept. 8, 2020).

For decades, FFL has invested heavily in developing its confidential and proprietary information, as well as its relationships with its clients, lead sources, referral partners and prospects. Defendants, having gained insider knowledge through their employment with FFL, now work for Sequel, a direct competitor, causing irreparably harm by using and/or disclosing FFL's confidential and proprietary business information. This misuse akin to a "cat out of the bag" injury, which cannot be remedied by monetary damages. *See TransUnion Risk & Alt. Data Sol., Inc. v. Reilly*,

181 So. 3d 548, 551 (Fla. 4th DCA 2015) (finding continued breach of a non-compete agreement has the ability to threaten the former employer's goodwill and relationships with its customers, and "nothing short of an injunction" could prevent such loss). Indeed, the prospective franchisees that have decided to do business with Sequel instead of FFL cannot be "unsolicited." *See Southeastern Mech. Servs., Inc. v. Brody*, 8:08-CV-1151-T-30EAJ, 2008 WL 4613046, at *15 (M.D. Fla. Oct. 15, 2008) (stating that once a defendant solicits a plaintiff's customers using the plaintiff's confidential information, the customers cannot be "unsolicited"). Further, the financial impact on FFL, including loss of existing and prospective clients, lead sources and referral partners and decreased margins as a result of Defendants' continued use and disclosure of FFL's confidential and proprietary business information, is incalculable, compounded by reputational damage from Defendants' disparaging remarks.

## IV.    The Balance of the Equities Weighs in FFL's Favor.

The balancing of the harms weighs strongly in FFL's favor. FFL faces the potential harm or loss of its Confidential Information, trade secrets, goodwill, business reputation, clients, lead sources, referral partners, and prospective franchisees, as well as market share to its competitor. As discussed, FFL has expended great time and resources in developing and protecting such information and relationships to prevent just this injury. On the other hand, the harm to Defendants "is minimal because the Court is simply requiring Defendants to do that which [they] willingly promised." *Freedom Medical, Inc. v. Sewpersaud*, 469 F. Supp. 3d 1269, 1279 (M.D. Fla. 2020).

**V.    The Issuance of Injunctive Relief Will Serve the Public Interest.**

Issuing injunctive relief serves the public interest by affirming the judicial system's role in uploading contract sanctity and allowing employers to rely, as they have for many years, upon valid restrictive covenants to protect their legitimate business interests. *See Mohr v. Bank of N.Y. Mellon Corp.*, 393 F. App'x 639, 646 (11th Cir. 2010); *see also Regions Bank v. Raymond James & Assoc., Inc.,* No. 6:20-cv-658-Orl-40EJK, 2020 WL 7419650, at *5 (M.D. Fla. Apr. 20, 2020) ("There is a strong public interest in protecting confidential information and enforcing restrictive covenants that promote legitimate business interests"). An injunction also will deter employees from violating valid and enforceable restrictive covenants. Finally, the granting of injunctive relief in this case will be consistent with Florida law and the public policy rationales underlying Fla. Stat. § 542.335. *See* Fla. Stat. § 542.335(1)(h).

**IV.    CONCLUSION[7]**

WHEREFORE, for the foregoing reasons, FFL respectfully requests that this Court grant FFL's Motion and enjoin Defendants' unlawful conduct to safeguard FFL's legitimate business interests.

> By: */s/ John S. Gibbs III*
> John S. Gibbs III
> Florida Bar No. 91102
> evan.gibbs@troutman.com

---

[7] Pursuant to the Agreements, Defendants expressly acknowledged that FFL shall "be entitled to equitable relief (***without the necessity of proving the inadequacy of monetary damages or the posting of any bond or security***)." Compl. Exs. A-B, § 11 (emphasis added). Further, this Court "has discretion to issue a preliminary injunction without requiring Plaintiff to post security." *Regions Bank*, 2020 WL 7419650, at *6. Given the evidence presented and the circumstances of this case, the Court should find that a bond is not required. *See id.* (finding no bond is required under similar circumstances).

Moses Tincher
(pro hac vice admission pending)
moses.tincher@troutman.com

TROUTMAN PEPPER LOCKE
LLP
600 Peachtree Street, NE Suite 3000
Atlanta, GA 30308
Telephone: 404.885.3000
Facsimile: 404.962.6522

Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**FRANCHISE FASTLANE, LLC**

      **Plaintiff,**

**v.**

**CANDICE WEETER and**
**RYAN LOGAN,**

      **Defendants.**

**Case No. 8:25-cv-02538-MSS-AAS**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed with the Clerk of the Court this 6th day of October 2025. A copy of the foregoing will be served on both Defendants via U.S. Mail on October 7, 2025.

- 27 -