# EXHIBIT

# 1

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**FRANCHISE FASTLANE, LLC**

                **Plaintiff,**

    **v.**

**CANDICE WEETER and RYAN LOGAN,**

                **Defendants.**

**Case No.  8:25-cv-02538-MSS-AAS**

## <u>DECLARATION OF TIM KOCH</u>

I, Tim Koch, being first duly sworn, depose and state as follows:

1.     My name is Tim Koch, I am over 18 years of age, and I am fully competent to execute this Declaration. I submit this Declaration solely for use in the above-captioned lawsuit and for no other purpose. The facts in this Declaration are true and correct to the best of my information and belief as of the date hereof and are based on my personal knowledge except here noted.

2.     I am currently employed as the President and Chief Operating Officer at Franchise Fastlane, LLC ("FFL").

3.     My duties at FFL include overseeing the strategic direction and day-to-day operations of FFL.

### FFL's Business

4.     FFL is a franchise sales organization. It specializes in outsourced franchise development, sales, and marketing services for franchisors. It also partners with both emerging and established franchisors and manages the entire franchisee sales lifecycle from initial lead

generation and prospect qualification to deal closure. Some of the franchise brands that FFL sells to prospective franchisees include bodenvy and Exercise Coach.

5.     FFL has developed and maintained, at significant expense, valuable and long-standing working relationships and substantial goodwill with its client's franchisees and prospective franchisees.

6.     FFL also relies heavily on cultivating and maintaining strong business relationships with its lead sources and referral partners, which are essential to its success in sourcing prospective franchisees. It has also invested millions of dollars over the years in building its employee relationships and reputations with its lead sources and referral partners. FFL's strong relationships with franchisors, franchisees, lead sources and referral partners have enabled it to expand franchises across thousands of communities nationwide.

7.     Generating prospective franchise leads through its relationships with its consultant networks is eighty-five to ninety percent of FFL's business.

8.     To maintain its competitive edge, FFL strategically provides its key employees, including Defendants Candice Weeter ("Weeter") and Ryan Logan ("Logan") (collectively, "Defendants"), with substantial training as well as unique knowledge and access to FFL's confidential information and materials. Such materials include, but are not limited to, FFL's trade secrets, business strategies, including pricing and sales strategies, financial data, marketing plans, franchisor/client lists, franchisee lists, prospective franchisee lists, lead source/referral partner information, operational procedures, and other information designated as confidential either expressly or by the circumstances in which it was provided.

9.      The success of FFL is dependent upon the confidentiality of its trade secrets and business information, and the loyalty and integrity of its employees to not misuse such information or otherwise compete against FFL in violation of their contractual obligations.

10.     FFL developed the confidential information at significant expense and effort, as it is not generally available to the public and FFL derives economic value from its confidential information.

11.     FFL takes reasonable efforts to maintain the confidentiality of such information, including having its employees with access to such information sign confidentiality agreements, using password-protected computers and devices, requiring employees to return company property when they leave the company, requiring franchisor clients and brands to treat FFL's confidential information as confidential, and sending letters to all departing employees reminding them of their obligations to protect FFL's Confidential Information and return Company property.

### Defendants' Employment with FFL

12.     FFL hired Weeter as a Director of Franchise Development in June 2022.

13.     FFL hired Logan as a Director of Franchise Development in July 2022.

14.     In their roles, Defendants engaged in sales efforts on behalf of FFL, including developing and maintaining direct and continuous relationships with franchisor clients, lead sources and referral partners. Defendants' duties were not limited by geographic scope; they maintained relationships with franchisor clients, lead sources and referral partners based across the United States.

15.     Defendants developed a significant number of contacts and relationships with FFL's franchisor clients, franchisees and prospective franchisees, lead sources and referral partners.

16.     In July 2025, FFL believes that Defendants were either approached or were approached by a former FFL employee named Jennifer Cain ("Cain"). Cain is currently an employee of Sequel Brands, LLC ("Sequel"). Cain actively solicited Defendants to resign from their positions at FFL and accept employment with Sequel.

17.     Sequel is a direct competitor of FFL. It launches and manages fitness and wellness brands.

18.     On July 17, 2025, Defendants attended a networking event for business-related purposes, which included a dinner networking boat cruise with the FranChoice Consultant Network ("FranChoice"), FFL's top lead source and referral partner. Approximately one hundred FranChoice consultants attended the event, as well as many of FFL's franchisor clients. Defendants were still employed with FFL at this time.

19.     During the cruise, Defendants made a public statement to the attendees of the cruise, including FFL's franchisor clients, lead sources, and referral partners, competitors and other FFL employees, that they intended to resign from FFL due to the "systemic toxic culture" at FFL and that FFL is having "issues."

20.     Defendants' statements were false, disparaging and defamatory, and led to significant concern among the lead sources, referral partners, franchisor clients and FFL employees, prompting them to question the stability of FFL.

21.     FFL had to spend significant time and effort to reassure and retain employees who learned about Defendants' comments during the cruise. Defendants intended to injure FFL with these false statements.

-4-

22.     Following the cruise, FFL leadership had spent weeks mitigating the impact with FFL's franchisor clients, lead sources, and referral partners. This created a huge distraction from FFL's business.

23.     Defendants' last day of employment with FFL was on July 31, 2025.

24.     Around that time, they began employment with Sequel full-time in roles similar to roles they held at FFL.

**Terms of Defendants' Proprietary Matters Agreements**

25.     As a condition of their employment, Defendants executed the Proprietary Matters Agreements (the "Agreements"), in which they agreed to comply with certain restrictive covenants both during and following their termination of employment with FFL.

26.     The Agreements include non-competition, non-disclosure, non-solicitation, and non-disparagement provisions.

27.     The non-competition provision prohibits Defendants from directly or indirectly working on behalf of any entity that competes with FFL or its affiliates, including but not limited to, any entity or business that provides similar products or services that FFL or any of its affiliates was developing during Defendants' employment with FFL for a period of eighteen months following the termination of Defendants' employment.

28.     The non-competition provision does not have a geographic restriction. The provision is intended to be a national geographic restriction covering the territories in which FFL operates to protect the use of FFL's confidential information (including franchisor client, franchisee and prospective franchisee and lead source and referral partner information) by direct competitors in a highly specialized and competitive market given the national reach of FFL's franchise-based business with services that are electronic in nature. Additionally, FFL does not

assign Directors of Franchise Development to contact clients, lead sources and referral partners solely in one geographic area or region.

29.    The non-disclosure provision prohibits Defendants during and after their employment with FFL from directly or indirectly disclosing FFL's confidential information to any person or entity. It also prohibits Defendants from using FFL's confidential information for any purpose or permitting the exploitation, copying, or summarizing of any confidential information except as specifically required in the proper performance of Defendants' duties for FFL.

30.    The non-solicitation provision prohibits Defendants from soliciting FFL's customers (as defined by the Agreements), employees, vendors, referral sources, suppliers, or encouraging such individuals to modify or cease their relationship or business with FFL during their employment period and for 18 months following their termination.

31.    The non-disparagement provision provides that while employed by FFL and following Defendants' termination for any reason, Defendants will not make any disparaging or defamatory comments regarding  FFL or any of its respective directors, managers, officers, employees or investors.

32.    The Agreements are governed by Florida law.

33.    The Agreements are supported by FFL's legitimate business interests in its confidential and proprietary information, substantial relationships with its existing and prospective customers, lead sources and referral partners, and the goodwill of customers and prospective customers, lead sources, and referral partners in the applicable marketplace for franchising.

34.    Defendants also expressly agreed that any breach of the terms of the Agreements will result in irreparable and continuing damage to FFL for which there may not be an adequate remedy at law, and that FFL would be entitled to equitable relief including injunctive relief.

**Defendants' Theft of FFL's Confidential Information and Trade Secrets**

35.     FFL forensically examined Defendants' FFL-issued laptops after their employment

terminated. The examination showed that in the days leading up to Defendants' departure, and

after their employment ended, Defendants accessed and stole numerous documents and files

containing FFL's highly proprietary and confidential information, including trade secrets, on their

FFL-issued laptops.

36.     HubSpot is a customer relationship management (CRM) platform which contains

numerous categories of customer data, such as contact information, order histories, customer

preferences, and many other non-public customer details. It is used for inbound marketing, sales,

and customer service.

37.     The examination shows that Logan made calls using FFL's HubSpot in the weeks

leading up to his separation from FFL. From the names of the recipients of these HubSpot calls, it

appears that Logan made these calls to prospective franchisees as well as lead sources and referral

partners for the purpose of competing against FFL.

38.     Similarly, Weeter accessed dozens of files leading up to her departure (which was

not consistent with her activities for FFL), and she also used her Sequel email account while still

employed at FFL.

39.     On July 28, 2025, Weeter received an email from a FranChoice consultant intended

to introduce her to a prospective franchisee. This email was sent to both her FFL and Sequel work

email accounts. After this initial email, no further communication occurred via her FFL account.

It is likely these discussions continued via her Sequel account in order to attract the prospective

franchisee.

40.     One document that Weeter accessed, both during and after her employment at FFL, is entitled "Canopy Franchise Fee_Commission Structure.xlsx." This is a spreadsheet containing FFL's highly confidential pricing structure.

41.     A competitor having access to "Canopy Franchise Fee_Commission Structure.xlsx." would give them knowledge as to what FFL charges in commissions for its brands.

42.     Another file that Weeter accessed leading up to her last day of employment is a spreadsheet titled "Call Log.xlsx," which contains a partial list of FFL's prospective franchisees and the markets in which they live or are interested. Weeter's job duties at FFL did not at the time require her to access or use such document.

43.     A competitor having access to "Call Log.xlsx," could use it to solicit business from these prospective franchisees to compete for brands that FFL may offer.

44.     Additionally, in the days leading up to their last day of employment and thereafter, Defendants continued to access FFL's confidential and proprietary information and trade secrets, including, but not limited to, Consultant and Candidate presentations for six different brands, Unit Economic Workbooks for eight different brands, and 2 Minute Drills for two different brands, Presentation Notes for two different brands, brand approval letters, and Confirmation Day Agendas.

45.     All of the aforementioned documents contain confidential and proprietary information and many also contain trade secrets in the form of marketing strategies.

46.     The aforementioned documents all contain marketing strategies in terms of how FFL positions a particular brand to its lead sources, referral partners and prospective franchisees in an effort to ultimately sell franchises for that brand.

-8-

47.    Two of the brands Defendants accessed and likely stole are in the health and wellness space and could be used by Sequel to position their brands more favorably and further compete with FFL brands.

48.    Weeter worked with only two of FFL's brands prior to her resignation. Her duties did not require her to access information or documents relating to the other brands.

### Defendants' Continued Violations of the Agreements

49.    While still employed at FFL, Defendants actively solicited FFL's lead sources and referral partners in order to refer FFL's prospective franchisees to use Sequel brands instead.

50.    At Sequel, Defendants are currently soliciting prospective franchisees for Sequel, diverting them from considering FFL's clients, both within and outside the wellness sector.

51.    Defendants are also currently engaging with the same lead sources and referral partners as FFL across the United States. This overlap poses a significant competitive threat to FFL, as both companies share lead sourcing strategies, including attending multiple consultant network events to promote their brands and build relationships with franchise consultants. Lead sources often direct franchisees to unrelated brands, with franchisees typically choosing only one. Thus, if a lead source refers a prospect to a Sequel brand, it is unlikely they will consider FFL's clients.

52.    Sequel's ownership of franchisor brands similar to FFL's creates a competitive environment that heavily influences prospective franchisees' decisions. These franchisees often prioritize franchisors offering diverse brands across industries, rather than specific brands.

53.    By way of example, FFL's client, The Exercise Coach, and Sequel's Body20 brand both offer tech-driven, personalized training sessions, including 20-minute workouts.

54.    This competition between Sequel and FFL brands significantly impacts franchisee choices, which affects FFL's market share and growth. (*Id.*)

55.    FFL has also recently learned that Weeter, by maintaining direct communication with FFL's lead sources and referral partners, solicited two prospective franchisees in July or August 2025 to engage with Sequel instead of FFL.

56.    Prior to Weeter's solicitation, one of the prospective franchisees was planning to invest $110,500 in two bodenvy franchise units, from which FFL stood to earn $43,400 and a 1% revenue stream over 10 years.

57.    After Weeter's solicitation, the prospective franchisee has not purchased a bodenvy franchise and likely chose Sequel's franchise.

58.    Defendants' actions so far have caused and threaten to continue causing irreparable harm to FFL. This harm includes the loss of business opportunities, damage to client, lead source, referral partner, and employee relationships, and harm to FFL's reputation and goodwill.

59.    Monetary damages alone are inadequate to remedy these ongoing and future injuries.

60.    FFL is seeking immediate injunctive relief to prevent Defendants from further violating their contractual obligations and to protect FFL's legitimate business interests.


I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is based on my personal knowledge and that it is true and correct.

_____
Tim Koch
President and COO of Franchise Fastlane, LLC

-10-

# EXHIBIT

# A

# PROPRIETARY MATTERS AGREEMENT

THIS PROPRIETARY MATTERS AGREEMENT (this "Agreement") is made and entered into effective this ____ day of June 2022, by and between Franchise FastLane, LLC ("Company") and Candice Milton ("Employee").

R E C I T A L S :

WHEREAS, Company has invested, and will continue to invest, substantial time, effort and money in the development of its trade secrets, business methods and procedures, operations, technology and other specific confidential and proprietary information which enables Company to compete successfully in its business;

WHEREAS, the unauthorized use or disclosure of such information would be greatly damaging to Company and the success of its business; and

WHEREAS, during the course of Employee's employment, Company will disclose to Employee, and allow Employee access to and the use of, knowledge concerning its trade secrets, business methods and procedures, operations, technology and other specific confidential and proprietary information, all of which constitute the property of Company.

NOW, THEREFORE, in consideration of, and as a condition to, Employee's employment by Company or any of its affiliates, and to allow Employee access to and use of its confidential and proprietary information, and for other good and valuable consideration, the receipt and sufficiency of which the parties acknowledge, Company and Employee agree as follows:

1. **Nondisclosure of Confidential Information.**

    a.    *Definition of Confidential Information.*  As used in this Agreement, the term "Confidential Information" means Company's and its affiliates' confidential and proprietary information, whether in writing or other form, and which includes, without limitation, Company's customers, prospective customers, and referral sources (including all customer lists and referral source lists); billing, collection, and financial data; memoranda and related research; proprietary software and the related source code; marketing concepts and strategies; training programs and related materials; business plans; strategic plans; pricing plans or methods; Intellectual Property; ideas; inventions; methods; designs; drawings; specifications; improvements; proposals; requests for proposals; research findings; studies and reports; products; services; technology or procedures offered or used by Company and its affiliates; and other related information regarding the business of Company and its affiliates and their products and professional services.  Employee expressly acknowledges and agrees that Confidential Information may include, without limitation, confidential and proprietary information belonging to various third parties, such as Company's customers, prospective customers, vendors, suppliers and referral sources, but which has been and will be entrusted to Company for use by Company to conduct its business.  The failure to mark or designate information as "confidential" or "proprietary" shall not prevent information from being "Confidential Information" under this Agreement.

b.      *Access*.  Employee acknowledges that employment with Company or any of its affiliates necessarily will involve exposure to and familiarity with the Confidential Information.

c.      *Employee's Obligations.* Employee further acknowledges that the Confidential Information is a valuable, special and unique asset of Company and its affiliates, such that the unauthorized disclosure or use by Employee or persons or entities outside Company would cause irreparable damage to the business of Company and its affiliates.  Accordingly, Employee agrees that, during and after Employee's employment with Company or any of its affiliates, Employee shall not directly or indirectly disclose to any person or entity or use for any purpose or permit the exploitation, copying, or summarizing of any Confidential Information, except as specifically required in the proper performance of Employee's duties for Company.  Employee represents and warrants that no such disclosure or use has occurred prior to the date of this Agreement.

d.      *Trade Secret Status.* Company considers much of its Confidential Information to constitute trade secrets ("Trade Secrets") that have independent value, and provide Company with a competitive advantage over its competitors who do not know the Trade Secrets, and are protected from unauthorized disclosure under applicable law.  However, whether or not the Confidential Information constitutes Trade Secrets, Employee acknowledges and agrees that the Confidential Information is protected from unauthorized disclosure or use due to Employee's covenants under this Agreement and Employee's fiduciary duties as an employee of Company.   Notwithstanding the foregoing, in accordance with the Defend Trade Secrets Act of 2016, Employee will not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of Trade Secrets that:  (i) is made (y) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney; and (z) solely for the purpose of reporting or investigating a suspected violation of law; or (ii) is made in a complaint or other document that is filed under seal in a lawsuit or other proceeding.  In the event Employee files a lawsuit for retaliation by Company for reporting a suspected violation of law, Employee may disclose Trade Secrets to Employee's attorney and use the Trade Secret information in the court proceeding only if Employee:  (i) files any document containing the Trade Secret under seal; and (ii) does not disclose the Trade Secret, except pursuant to court order.

e.      *Protections*.  Employee acknowledges that Company has instituted, and will continue to institute, update, and amend policies and procedures designed to protect the confidentiality and security of Confidential Information, including, but not limited to, policies and procedures designed by Company to protect the status of Trade Secrets and other Confidential Information.  Employee agrees to take all appropriate action, whether by instruction, agreement or otherwise, to ensure the protection, confidentiality and security of Confidential Information, to protect the status of Trade Secrets, and to satisfy Employee's obligations under this Agreement.

f.      *Return of Documents.* Employee acknowledges and agrees that the Confidential Information is and at all times shall remain the sole and exclusive property of Company.  On termination of Employee's employment with Company or any of its

2

DocuSign Envelope ID: 32D1AC17-0497-4F66-84EF-800C49575423

affiliates, or whenever Company requests, Employee will promptly return to Company in good condition all Company property, including, without limitation, all documents, data and records of any kind, whether in hard copy or electronic form, that contain any Confidential Information or that were prepared based on Confidential Information, including any and all copies thereof, as well as all materials furnished to or acquired by Employee during the course of Employee's employment with Company or any of its affiliates. Employee shall keep no Confidential Information in any form or medium.

2. **Development of Intellectual Property.**

a. *Definition of Intellectual Property.* As used in this Agreement, "Intellectual Property" includes, without limitation, any inventions, technological innovations, discoveries, designs, formulas, know-how, processes, business methods, patents, trademarks, service marks, copyrights, computer software, ideas, creations, writings, lectures, illustrations, photographs, motion pictures, scientific and mathematical models, improvements to all such property, and all recorded material defining, describing or illustrating all such property, whether in hard copy or electronic form.

b. *Company's Rights in Intellectual Property.* Employee agrees that Company will own all right, title and interest of every kind and nature, whether now known or unknown, in and to any Intellectual Property invented, created, written, developed, conceived or produced by Employee during Employee's employment with Company or any of its affiliates (i) whether using Company's equipment, supplies, facilities and/or Confidential Information, (ii) whether alone or jointly with others, (iii) whether or not contemplated by the terms of Employee's employment, and (iv) whether or not during normal working hours, that are within the scope of Company's actual or anticipated business operations or that relate to any of Company's actual or anticipated products or services (collectively, "Company Intellectual Property"). All Company Intellectual Property is "work made for hire" under the U.S. Copyright Act, 17 U.S.C. §101 et seq., as amended. If any right, title or interest in or to any Company Intellectual Property (including, without limitation, any U.S. or foreign copyrights, trademarks, patents or other Intellectual Property right) has not vested or will not vest automatically in and with Company, Employee will and by this Agreement does irrevocably assign, convey, and otherwise transfer to Company, and Company's successors and assigns, all such right, title and interest in and to the Company Intellectual Property with no requirement of further consideration from or action by Employee or Company. If this Agreement must be construed in accordance with the laws of any state precluding a requirement in an employee or other service provider agreement to assign certain classes of inventions made by an employee or other service provider, this Section will be interpreted not to apply to any invention which a court rules and/or Company agrees falls within such classes.

c. *Employee's Obligations.*

i. Employee shall not directly or indirectly disclose to any person or entity or use for any purpose or permit the exploitation, copying or summarizing of any Company Intellectual Property, except as specifically required in the proper performance of Employee's duties for Company. Employee represents and

DocuSign Envelope ID: 32D1AC17-0497-4F66-84EF-800C4957E423

warrants that no such unauthorized disclosure or unauthorized use has occurred prior to the date of this Agreement. Employee will take all actions reasonably necessary for Company to obtain, register, perfect and/or otherwise protect its rights in Company Intellectual Property in the United States and all foreign countries. Employee irrevocably waives any "moral rights," or other rights with respect to attribution of authorship or integrity of Company Intellectual Property, that Employee may have under any applicable law under any legal theory.

ii.     Without limiting the generality of the foregoing, Employee consents and agrees to: a) promptly and fully disclose to Company any and all Company Intellectual Property; b) to the extent any assignment cannot be made at present, assign to Company all rights to Company Intellectual Property without limitation or royalty; and c) execute all documents necessary for Company to obtain, register, perfect, or otherwise protect its rights in Company Intellectual Property. Consideration for Employee's assignment to Company is hereby acknowledged. In the event Company is unable, after reasonable effort, to secure Employee's signature on any documents necessary to effectuate the provisions of this Section 2, Employee irrevocably designates and appoints Company as Employee's agent and attorney-in-fact, to act for and on Employee's behalf, and to execute any such documents and to do all other lawfully permitted acts to further the protection of Company Intellectual Property with the same legal force and effect as if executed by Employee.

iii.     To the extent, if any, that any Company Intellectual Property is unassignable or that Employee retains any right, title or interest in and to any Company Intellectual Property, Employee: a) unconditionally and irrevocably waives the enforcement of such rights, and all claims and causes of action of any kind against Company with respect to such rights; b) agrees, at Company's request, to consent to and join in any action to enforce such rights; and c) grants to Company a perpetual, irrevocable, exclusive, fully paid-up, royalty-free, transferable, sub-licensable (through multiple levels of sublicenses), worldwide right and license to use, reproduce, distribute, display and perform (whether publicly or otherwise), prepare derivative works of and otherwise modify, make, have made, sell, offer to sell, import and otherwise use, disclose and exploit (and have others exercise such rights on behalf of Company) all or any portion of Company Intellectual Property, in any form or media (now known or later developed). The foregoing license includes, without limitation, the right to make any modifications to Company Intellectual Property regardless of the effect of such modifications on the integrity of Company Intellectual Property, and to identify Employee, or not to identify Employee, as one or more authors of or contributors to Company Intellectual Property or any portion of it, whether or not Company Intellectual Property or any portion of it has been modified.

iv.     Company shall have the exclusive right, but not the obligation, to prosecute or to seek to end any perceived acts of infringement or misappropriation of, or other violation of its rights in and to the Company Intellectual Property. The total cost of any such efforts commenced by Company shall be borne by Company,

and Company shall be entitled to any recovery or damages derived therefrom. Employee agrees to assist Company in connection with any demands, reissues, oppositions, litigation, controversy or other actions involving any item of Company Intellectual Property.

v.     Employee will undertake the foregoing obligations both during and after Employee's employment with Company or any of its affiliates, without charge, but at Company's expense with respect to Employee's reasonable and documented out-of-pocket costs.  Employee further agrees that Company may, in its sole discretion, deem Company Intellectual Property as a Trade Secret, in which case Employee will comply with the Confidential Information provisions in this Agreement.

3.     **Acknowledgement of Company's Goodwill.**    Employee acknowledges that Company has expended and will continue to expend considerable time, effort and resources to develop and market its products and professional services, that the relationships between Company and its employees, customers, and referral sources are valuable assets of Company and key to its success, and that employees of Company establish close professional relationships with other employees, customers, and referral sources of Company in the course of their relationship with Company, all of which constitute goodwill of Company ("Goodwill").  These strong business relationships developed over time allow Company to provide the best possible solutions for its customers by providing Company with an unequaled and valuable understanding of its customers' individual needs.

4.     **Nonsolicitation of Employees, Vendors, Referral Sources and Customers.**  In order to prevent the improper use of Confidential Information and the resulting unfair competition and misappropriation of Goodwill and other proprietary interests, Employee agrees that, while Employee is employed by Company or any of its affiliates and for a period of eighteen (18) months following the termination of Employee's employment for any reason whatsoever, whether such termination is voluntary or involuntary, and regardless of cause, Employee will not, directly or indirectly, on Employee's own behalf or by aiding any other individual or entity:

a.     Encourage, discourage, interfere with, or otherwise cause or attempt to cause, in any manner, any referral source, vendor, or supplier of Company or any of its affiliates to curtail, sever, or alter its relationship or business with Company or any of its affiliates; or

b.     Hire, employ or engage, or attempt to hire or solicit for employment or engagement, any individual who is an employee or independent contractor of Company or any of its affiliates or was an employee or independent contractor of Company within the twelve (12) month period immediately preceding the hire, employment, engagement or attempt to hire or solicitation of the individual; or

c.     Call on, solicit, divert, serve, or accept business from, or attempt to solicit or divert any Customers, except in performance of Employee's duties on behalf of Company. For purposes of this Agreement "Customer" includes: a) any ultimate end customer individual or entity whom Company or any affiliate is introduced to or referred

DocuSign Envelope ID: 32D1AC17-0497-4F66-84EF-800C49575423

to; and b) any ultimate end customer individual or entity to which Company or any affiliate provides its products or services; provided, however, that the restrictions of this Section 4.c. following the termination of Employee's employment shall only apply to Customers with whom Company or any affiliate did business or solicited for business during the twelve (12) month period immediately prior to the termination of Employee's employment.

5. **Noncompetition**. In order to prevent the improper use of Confidential Information and the resulting unfair competition and misappropriation of Goodwill and other proprietary interests, Employee agrees that, while Employee is employed by Company or any of its affiliates and for a period of eighteen (18) months following the termination of Employee's employment for any reason whatsoever, whether such termination is voluntary or involuntary, and regardless of cause, Employee shall not, except in performance of Employee's duties on behalf of Company, directly or indirectly, be involved as an owner, partner, shareholder, joint venturer, director, officer, employee, agent, independent contractor, or otherwise, of any entity or business that competes with Company or any of its affiliates, including, but not limited to, any Franchise Broker (as defined below) and any entity or business that provides products or services Company or any of its affiliates was developing during Employee's employment with Company or any of its affiliates. Notwithstanding the foregoing, Employee's ownership solely as an investor of two percent (2%) or less of the outstanding securities of any business or association which is publicly traded on a national stock exchange shall not, by itself, be considered to be competition with Company for purposes of this Section. For purposes of this Section 5, the phrase "Franchise Broker" includes, but is not limited to, FranChoice, Inc., The Franchise Consulting Company (a/k/a FCC), FranNet, LLC, International Franchise Professionals Group (a/k/a IFPG), FranServe, Inc., Business Alliance, Inc. (a/k/a BAI), The You Network, Franchise Brokers Association (a/k/a FBA), and any other similar franchise broker organization or association.

6. **Non-Disparagement**. Employee agrees that, while Employee is employed by Company or any of its affiliates and following the termination of Employee's employment for any reason whatsoever, whether such termination is voluntary or involuntary, and regardless of cause, Employee shall not make any disparaging or defamatory comments regarding Company or any of its affiliates or any of their respective directors, managers, officers, employees or investors. However, the obligations under this Section 6 will not apply to: (i) disclosures required by applicable law, regulation, any legal process, or order of a court or governmental agency and (ii) disclosures made in connection with defending or prosecuting any dispute before a court or arbitrator between Employee and Company or any of its affiliates or any other third party.

7. **Reasonable Restrictions.**

a. *Applicable to any Status.* Employee acknowledges and agrees that the post-employment obligations of this Agreement shall be applicable to Employee regardless of whether Employee engages in any such solicitations or competing business activity as an individual or as a sole proprietor, stockholder, partner, member, officer, director, employee, agent, consultant, or independent contractor of any other entity.

b. *Reasonable Restriction.* In signing this Agreement, Employee is fully aware of the restrictions that this Agreement places upon Employee's future employment or contractual opportunities with a party other than Company. However, Employee

DocuSign Envelope ID: 3DD1AC17-0497-4F66-84EF-800C49575423

understands and agrees that Employee's employment by Company or any of its affiliates, Employee's privileged position with Company, and Employee's access to Confidential Information and Company Intellectual Property makes such restrictions both necessary and reasonable to protect the legitimate business interests of the Company. Employee acknowledges and agrees that the restrictions imposed by this Agreement constitute reasonable protections of the legitimate business interests of Company and that they will not unduly restrict Employee's opportunity to earn a reasonable living following the termination of Employee's employment.

8. **No Other Employment or Business Ownership.** During the term of Employee's employment with Company or any of its affiliates, Employee shall devote Employee's full working time, attention, knowledge, and skills to the business and interests of Company and its affiliates, unless otherwise approved in advance by Company. Due to the requirement to devote full-time efforts to Company and its affiliates, Employee shall refrain from ownership in any entity or business that would require Employee to devote oversight, management, or other working efforts, unless otherwise approved in advance by Company; provided that, Employee's ownership solely as an investor of two percent (2%) or less of the outstanding securities of any business or association which is publicly traded on a national stock exchange shall not be prohibited by this Section. Company acknowledges that Employee, as of the date of this Agreement, owns approximately thirty percent (30%) of Tilted Concepts. Employee represents that, other than such ownership interest, she has no other involvement with Tilted Concepts and that she is actively seeking to sell all of such ownership interest. Employee agrees that, during the term of Employee's employment with Company or any of its affiliates, she will not devote any oversight, management, or other working efforts for or on behalf of Tilted Concepts unless otherwise approved in advance by Company. Employee further agrees to keep Company informed of the status of the sale of her ownership interest in Tilted Concepts and to notify Company promptly following the consummation of any such sale.

9. **Confidential Information of Others.** Employee represents that (a) Employee's employment with Company shall not breach any contract, agreement or understanding, oral or written, to which Employee is a party or by which Employee is bound; (b) Employee's employment with Company will not cause Employee to disclose or use any confidential or proprietary information or trade secrets belonging to any other person or entity; and (c) Employee does not have and shall not bring to Company or use in connection with Employee's employment with Company any confidential or proprietary information or trade secrets belonging to another person or entity.

10. **Notification.** Employee acknowledges and agrees that Company may notify anyone employing or contracting with Employee or evidencing an intention to employ or contract with Employee of the existence and provisions of this Agreement.

11. **Enforcement.** Employee acknowledges and agrees that, by reason of the sensitive nature of the Confidential Information, Company Intellectual Property, Trade Secrets and Goodwill referred to in this Agreement, a breach of any of the promises or agreements contained herein will result in irreparable and continuing damage to Company for which there may not be an adequate remedy at law. If Employee violates any of the terms of this Agreement or threatens to violate any of the terms of this Agreement, all Company obligations under this Agreement shall

DocuSign Envelope ID: 32D1AC17-0497-4F66-84EF-800C4957E423

cease without relieving Employee of his or her continuing obligations hereunder. Employee acknowledges and agrees that, in addition to the recovery of damages and any other legal relief to which Company may be entitled in the event of Employee's violation of this Agreement, including, but not limited to, an equitable accounting of all profits and benefits arising out of such breach or threatened breach, and all losses, damages, costs and expenses arising therefrom, including, without limitation, reasonable attorneys' fees and costs, Company shall also be entitled to equitable relief (without the necessity of proving the inadequacy of monetary damages or the posting of any bond or security), including such injunctive relief as may be necessary to protect the interests of Company in such Confidential Information, Company Intellectual Property, Trade Secrets and Goodwill, and as may be necessary to specifically enforce this Agreement. Employee acknowledges and agrees that the covenants set forth in this Agreement shall not supersede or modify any other agreement between Employee and Company or any of its affiliates relating to restrictive covenants, including, without limitation, any covenants entered into under an equity incentive instrument or sale transaction agreement, and that any breach of the restrictive covenants under this Agreement or any such other agreement may be deemed a breach of one or both.

12. **Reformation and Severability.** Employee and Company intend and agree that if a court of competent jurisdiction determines that the scope of any provision of this Agreement is too broad to be enforced as written, the court should reform such provision(s) to such narrower scope as it determines to be enforceable. Employee and Company further agree that if any provision of this Agreement is determined to be unenforceable for any reason, and such provision cannot be reformed by the court as anticipated above, such provision shall be deemed separate and severable and the unenforceability of any such provision shall not invalidate or render unenforceable any of the remaining provisions hereof.

13. **Integration and Amendments.** This Agreement, including the initial paragraph and the recitals to this Agreement, each of which is incorporated herein and made part of this Agreement by this reference, is a complete agreement between the parties and supersedes all prior discussions, negotiations and agreements with regard to the subject matter herein, whether oral or written. This Agreement shall be binding upon and for the benefit of the parties and their respective heirs, executors, administrators, successors, devisees, permissible assigns, personal representatives, and legal representatives. No supplement, modification, or amendment to this Agreement shall be binding unless executed in writing by Employee and Company.

14. **Waiver.** Any waiver by either party of a breach of any provision of this Agreement shall not operate or be construed as, a waiver of any subsequent breach or provision hereof.

15. **Miscellaneous.**

    a. *At-will Employment.* Nothing contained in this Agreement shall be deemed to alter or modify Employee's status as an at-will employee of Company or of any of its affiliates.

    b. *Governing Law.* This Agreement shall be governed by, construed, and enforced in accordance with the laws of the State of Florida.

c.    *Survival.*  Employee's obligations hereunder shall survive the termination of Employee's employment with Company or with any of its affiliates or any other agreement or relationship between Employee and Company or any of its affiliates.

d.    *Assignability.*  This Agreement and the rights, interests and obligations hereunder shall be assignable by Company.   This Agreement is not assignable by Employee.

e.    *No Election of Remedies*.  Except as otherwise specifically provided herein, the rights and remedies accorded herein to Company are cumulative and in addition to those provided by law or in equity, and may be exercised separately, concurrently or successively.

f.    *Counterparts*.  This Agreement may be executed in multiple counterparts.

16.    **Employee's Copy**.  EMPLOYEE ACKNOWLEDGES THAT EMPLOYEE HAS RECEIVED A COPY OF THIS AGREEMENT AND HAS READ, UNDERSTOOD AND AGREES TO BE BOUND BY THE TERMS AND CONDITIONS CONTAINED IN THIS AGREEMENT.

**[Signature Page Follows.]**

This Proprietary Matters Agreement has been executed as of the date first written above.

Franchise FastLane, LLC

By: _____          _____

Its: _____CEO_____          _____, Employee
                                                            Candice Milton

# EXHIBIT

# B

**PROPRIETARY MATTERS AGREEMENT**

THIS PROPRIETARY MATTERS AGREEMENT (this "Agreement") is made and entered into effective this <u>15</u> day of July 2022, by and between Franchise FastLane, LLC ("Company") and Ryan Logan ("Employee").

R E C I T A L S :

WHEREAS, Company has invested, and will continue to invest, substantial time, effort and money in the development of its trade secrets, business methods and procedures, operations, technology and other specific confidential and proprietary information which enables Company to compete successfully in its business;

WHEREAS, the unauthorized use or disclosure of such information would be greatly damaging to Company and the success of its business; and

WHEREAS, during the course of Employee's employment, Company will disclose to Employee, and allow Employee access to and the use of, knowledge concerning its trade secrets, business methods and procedures, operations, technology and other specific confidential and proprietary information, all of which constitute the property of Company.

NOW, THEREFORE, in consideration of, and as a condition to, Employee's employment by Company or any of its affiliates, and to allow Employee access to and use of its confidential and proprietary information, and for other good and valuable consideration, the receipt and sufficiency of which the parties acknowledge, Company and Employee agree as follows:

1.    **<u>Nondisclosure of Confidential Information.</u>**

a.    *Definition of Confidential Information.*  As used in this Agreement, the term "Confidential Information" means Company's and its affiliates' confidential and proprietary information, whether in writing or other form, and which includes, without limitation, Company's customers, prospective customers, and referral sources (including all customer lists and referral source lists); billing, collection, and financial data; memoranda and related research; proprietary software and the related source code; marketing concepts and strategies; training programs and related materials; business plans; strategic plans; pricing plans or methods; Intellectual Property; ideas; inventions; methods; designs; drawings; specifications; improvements; proposals; requests for proposals; research findings; studies and reports; products; services; technology or procedures offered or used by Company and its affiliates; and other related information regarding the business of Company and its affiliates and their products and professional services. Employee expressly acknowledges and agrees that Confidential Information may include, without limitation, confidential and proprietary information belonging to various third parties, such as Company's customers, prospective customers, vendors, suppliers and referral sources, but which has been and will be entrusted to Company for use by Company to conduct its business. The failure to mark or designate information as "confidential" or "proprietary" shall not prevent information from being "Confidential Information" under this Agreement.

DocuSign Envelope ID: 9B3A8748-9FDA-4C3C-8C47-08ED5D71CE2F

b.      *Access*.  Employee acknowledges that employment with Company or any of its affiliates necessarily will involve exposure to and familiarity with the Confidential Information.

c.      *Employee's Obligations.* Employee further acknowledges that the Confidential Information is a valuable, special and unique asset of Company and its affiliates, such that the unauthorized disclosure or use by Employee or persons or entities outside Company would cause irreparable damage to the business of Company and its affiliates.  Accordingly, Employee agrees that, during and after Employee's employment with Company or any of its affiliates, Employee shall not directly or indirectly disclose to any person or entity or use for any purpose or permit the exploitation, copying, or summarizing of any Confidential Information, except as specifically required in the proper performance of Employee's duties for Company.  Employee represents and warrants that no such disclosure or use has occurred prior to the date of this Agreement.

d.      *Trade Secret Status.* Company considers much of its Confidential Information to constitute trade secrets ("Trade Secrets") that have independent value, and provide Company with a competitive advantage over its competitors who do not know the Trade Secrets, and are protected from unauthorized disclosure under applicable law.  However, whether or not the Confidential Information constitutes Trade Secrets, Employee acknowledges and agrees that the Confidential Information is protected from unauthorized disclosure or use due to Employee's covenants under this Agreement and Employee's fiduciary duties as an employee of Company.  Notwithstanding the foregoing, in accordance with the Defend Trade Secrets Act of 2016, Employee will not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of Trade Secrets that:  (i) is made (y) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney; and (z) solely for the purpose of reporting or investigating a suspected violation of law; or (ii) is made in a complaint or other document that is filed under seal in a lawsuit or other proceeding.  In the event Employee files a lawsuit for retaliation by Company for reporting a suspected violation of law, Employee may disclose Trade Secrets to Employee's attorney and use the Trade Secret information in the court proceeding only if Employee:  (i) files any document containing the Trade Secret under seal; and (ii) does not disclose the Trade Secret, except pursuant to court order.

e.      *Protections*.  Employee acknowledges that Company has instituted, and will continue to institute, update, and amend policies and procedures designed to protect the confidentiality and security of Confidential Information, including, but not limited to, policies and procedures designed by Company to protect the status of Trade Secrets and other Confidential Information.  Employee agrees to take all appropriate action, whether by instruction, agreement or otherwise, to ensure the protection, confidentiality and security of Confidential Information, to protect the status of Trade Secrets, and to satisfy Employee's obligations under this Agreement.

f.      *Return of Documents.* Employee acknowledges and agrees that the Confidential Information is and at all times shall remain the sole and exclusive property of Company.  On termination of Employee's employment with Company or any of its

affiliates, or whenever Company requests, Employee will promptly return to Company in good condition all Company property, including, without limitation, all documents, data and records of any kind, whether in hard copy or electronic form, that contain any Confidential Information or that were prepared based on Confidential Information, including any and all copies thereof, as well as all materials furnished to or acquired by Employee during the course of Employee's employment with Company or any of its affiliates. Employee shall keep no Confidential Information in any form or medium.

2.    **Development of Intellectual Property.**

      a.    *Definition of Intellectual Property.* As used in this Agreement, "Intellectual Property" includes, without limitation, any inventions, technological innovations, discoveries, designs, formulas, know-how, processes, business methods, patents, trademarks, service marks, copyrights, computer software, ideas, creations, writings, lectures, illustrations, photographs, motion pictures, scientific and mathematical models, improvements to all such property, and all recorded material defining, describing or illustrating all such property, whether in hard copy or electronic form.

      b.    *Company's Rights in Intellectual Property.* Employee agrees that Company will own all right, title and interest of every kind and nature, whether now known or unknown, in and to any Intellectual Property invented, created, written, developed, conceived or produced by Employee during Employee's employment with Company or any of its affiliates (i) whether using Company's equipment, supplies, facilities and/or Confidential Information, (ii) whether alone or jointly with others, (iii) whether or not contemplated by the terms of Employee's employment, and (iv) whether or not during normal working hours, that are within the scope of Company's actual or anticipated business operations or that relate to any of Company's actual or anticipated products or services (collectively, "Company Intellectual Property"). All Company Intellectual Property is "work made for hire" under the U.S. Copyright Act, 17 U.S.C. §101 et seq., as amended. If any right, title or interest in or to any Company Intellectual Property (including, without limitation, any U.S. or foreign copyrights, trademarks, patents or other Intellectual Property right) has not vested or will not vest automatically in and with Company, Employee will and by this Agreement does irrevocably assign, convey, and otherwise transfer to Company, and Company's successors and assigns, all such right, title and interest in and to the Company Intellectual Property with no requirement of further consideration from or action by Employee or Company. If this Agreement must be construed in accordance with the laws of any state precluding a requirement in an employee or other service provider agreement to assign certain classes of inventions made by an employee or other service provider, this Section will be interpreted not to apply to any invention which a court rules and/or Company agrees falls within such classes.

      c.    *Employee's Obligations.*

          i.    Employee shall not directly or indirectly disclose to any person or entity or use for any purpose or permit the exploitation, copying or summarizing of any Company Intellectual Property, except as specifically required in the proper performance of Employee's duties for Company. Employee represents and

warrants that no such unauthorized disclosure or unauthorized use has occurred prior to the date of this Agreement. Employee will take all actions reasonably necessary for Company to obtain, register, perfect and/or otherwise protect its rights in Company Intellectual Property in the United States and all foreign countries. Employee irrevocably waives any "moral rights," or other rights with respect to attribution of authorship or integrity of Company Intellectual Property, that Employee may have under any applicable law under any legal theory.

      ii.    Without limiting the generality of the foregoing, Employee consents and agrees to: a) promptly and fully disclose to Company any and all Company Intellectual Property; b) to the extent any assignment cannot be made at present, assign to Company all rights to Company Intellectual Property without limitation or royalty; and c) execute all documents necessary for Company to obtain, register, perfect, or otherwise protect its rights in Company Intellectual Property. Consideration for Employee's assignment to Company is hereby acknowledged. In the event Company is unable, after reasonable effort, to secure Employee's signature on any documents necessary to effectuate the provisions of this Section 2, Employee irrevocably designates and appoints Company as Employee's agent and attorney-in-fact, to act for and on Employee's behalf, and to execute any such documents and to do all other lawfully permitted acts to further the protection of Company Intellectual Property with the same legal force and effect as if executed by Employee.

      iii.    To the extent, if any, that any Company Intellectual Property is unassignable or that Employee retains any right, title or interest in and to any Company Intellectual Property, Employee: a) unconditionally and irrevocably waives the enforcement of such rights, and all claims and causes of action of any kind against Company with respect to such rights; b) agrees, at Company's request, to consent to and join in any action to enforce such rights; and c) grants to Company a perpetual, irrevocable, exclusive, fully paid-up, royalty-free, transferable, sub-licensable (through multiple levels of sublicenses), worldwide right and license to use, reproduce, distribute, display and perform (whether publicly or otherwise), prepare derivative works of and otherwise modify, make, have made, sell, offer to sell, import and otherwise use, disclose and exploit (and have others exercise such rights on behalf of Company) all or any portion of Company Intellectual Property, in any form or media (now known or later developed). The foregoing license includes, without limitation, the right to make any modifications to Company Intellectual Property regardless of the effect of such modifications on the integrity of Company Intellectual Property, and to identify Employee, or not to identify Employee, as one or more authors of or contributors to Company Intellectual Property or any portion of it, whether or not Company Intellectual Property or any portion of it has been modified.

      iv.    Company shall have the exclusive right, but not the obligation, to prosecute or to seek to end any perceived acts of infringement or misappropriation of, or other violation of its rights in and to the Company Intellectual Property. The total cost of any such efforts commenced by Company shall be borne by Company,

and Company shall be entitled to any recovery or damages derived therefrom. Employee agrees to assist Company in connection with any demands, reissues, oppositions, litigation, controversy or other actions involving any item of Company Intellectual Property.

v.    Employee will undertake the foregoing obligations both during and after Employee's employment with Company or any of its affiliates, without charge, but at Company's expense with respect to Employee's reasonable and documented out-of-pocket costs. Employee further agrees that Company may, in its sole discretion, deem Company Intellectual Property as a Trade Secret, in which case Employee will comply with the Confidential Information provisions in this Agreement.

3.    **Acknowledgement of Company's Goodwill.** Employee acknowledges that Company has expended and will continue to expend considerable time, effort and resources to develop and market its products and professional services, that the relationships between Company and its employees, customers, and referral sources are valuable assets of Company and key to its success, and that employees of Company establish close professional relationships with other employees, customers, and referral sources of Company in the course of their relationship with Company, all of which constitute goodwill of Company ("Goodwill"). These strong business relationships developed over time allow Company to provide the best possible solutions for its customers by providing Company with an unequaled and valuable understanding of its customers' individual needs.

4.    **Nonsolicitation of Employees, Vendors, Referral Sources and Customers.** In order to prevent the improper use of Confidential Information and the resulting unfair competition and misappropriation of Goodwill and other proprietary interests, Employee agrees that, while Employee is employed by Company or any of its affiliates and for a period of eighteen (18) months following the termination of Employee's employment for any reason whatsoever, whether such termination is voluntary or involuntary, and regardless of cause, Employee will not, directly or indirectly, on Employee's own behalf or by aiding any other individual or entity:

a.    Encourage, discourage, interfere with, or otherwise cause or attempt to cause, in any manner, any referral source, vendor, or supplier of Company or any of its affiliates to curtail, sever, or alter its relationship or business with Company or any of its affiliates; or

b.    Hire, employ or engage, or attempt to hire or solicit for employment or engagement, any individual who is an employee or independent contractor of Company or any of its affiliates or was an employee or independent contractor of Company within the twelve (12) month period immediately preceding the hire, employment, engagement or attempt to hire or solicitation of the individual; or

c.    Call on, solicit, divert, serve, or accept business from, or attempt to solicit or divert any Customers, except in performance of Employee's duties on behalf of Company. For purposes of this Agreement "Customer" includes: a) any ultimate end customer individual or entity whom Company or any affiliate is introduced to or referred

to; and b) any ultimate end customer individual or entity to which Company or any affiliate provides its products or services; provided, however, that the restrictions of this Section 4.c. following the termination of Employee's employment shall only apply to Customers with whom Company or any affiliate did business or solicited for business during the twelve (12) month period immediately prior to the termination of Employee's employment.

5.    **Noncompetition**.  In order to prevent the improper use of Confidential Information and the resulting unfair competition and misappropriation of Goodwill and other proprietary interests, Employee agrees that, while Employee is employed by Company or any of its affiliates and for a period of eighteen (18) months following the termination of Employee's employment for any reason whatsoever, whether such termination is voluntary or involuntary, and regardless of cause, Employee shall not, except in performance of Employee's duties on behalf of Company, directly or indirectly, be involved as an owner, partner, shareholder, joint venturer, director, officer, employee, agent, independent contractor, or otherwise, of any entity or business that competes with Company or any of its affiliates, including, but not limited to, any Franchise Broker (as defined below) and any entity or business that provides products or services Company or any of its affiliates was developing during Employee's employment with Company or any of its affiliates.  Notwithstanding the foregoing, Employee's ownership solely as an investor of two percent (2%) or less of the outstanding securities of any business or association which is publicly traded on a national stock exchange shall not, by itself, be considered to be competition with Company for purposes of this Section.  For purposes of this Section 5, the phrase "Franchise Broker" includes, but is not limited to, FranChoice, Inc., The Franchise Consulting Company (a/k/a FCC), FranNet, LLC, International Franchise Professionals Group (a/k/a IFPG), FranServe, Inc., Business Alliance, Inc. (a/k/a BAI), The You Network, Franchise Brokers Association (a/k/a FBA), and any other similar franchise broker organization or association.

6.    **Non-Disparagement**.  Employee agrees that, while Employee is employed by Company or any of its affiliates and following the termination of Employee's employment for any reason whatsoever, whether such termination is voluntary or involuntary, and regardless of cause, Employee shall not make any disparaging or defamatory comments regarding Company or any of its affiliates or any of their respective directors, managers, officers, employees or investors. However, the  obligations under this Section 6 will not apply to: (i) disclosures required by applicable law, regulation, any legal process, or order of a court or governmental agency and (ii) disclosures made in connection with defending or prosecuting any dispute before a court or arbitrator between Employee and Company or any of its affiliates or any other third party.

7.    **Reasonable Restrictions.**

a.    *Applicable to any Status.*  Employee acknowledges and agrees that the post-employment obligations of this Agreement shall be applicable to Employee regardless of whether Employee engages in any such solicitations or competing business activity as an individual or as a sole proprietor, stockholder, partner, member, officer, director, employee, agent, consultant, or independent contractor of any other entity.

b.    *Reasonable Restriction.*  In signing this Agreement, Employee is fully aware of the restrictions that this Agreement places upon Employee's future employment or contractual opportunities with a party other than Company.  However, Employee

understands and agrees that Employee's employment by Company or any of its affiliates, Employee's privileged position with Company, and Employee's access to Confidential Information and Company Intellectual Property makes such restrictions both necessary and reasonable to protect the legitimate business interests of the Company. Employee acknowledges and agrees that the restrictions imposed by this Agreement constitute reasonable protections of the legitimate business interests of Company and that they will not unduly restrict Employee's opportunity to earn a reasonable living following the termination of Employee's employment.

8. **No Other Employment or Business Ownership.** During the term of Employee's employment with Company or any of its affiliates, Employee shall devote Employee's full working time, attention, knowledge, and skills to the business and interests of Company and its affiliates, unless otherwise approved in advance by Company. Due to the requirement to devote full-time efforts to Company and its affiliates, Employee shall refrain from ownership in any entity or business that would require Employee to devote oversight, management, or other working efforts, unless otherwise approved in advance by Company; provided that, Employee's ownership solely as an investor of two percent (2%) or less of the outstanding securities of any business or association which is publicly traded on a national stock exchange shall not be prohibited by this Section. Company acknowledges that Employee, as of the date of this Agreement, owns approximately ten percent (10%) of Tilted Concepts, which includes Tune Up-The Manly Salon and Balanced Foods. Employee represents that, other than such ownership interest, he has no other involvement with Tilted Concepts, Tune Up-The Manly Salon and Balanced Foods. Employee agrees that, during the term of Employee's employment with Company or any of its affiliates, he will not devote any oversight, management, franchise development or other working efforts for or on behalf of Tilted Concepts, Tune Up-The Manly Salon and Balanced Foods, unless otherwise approved in advance by Company. Employee further agrees to keep Company informed if there is a sale of his ownership interest in Tilted Concepts, Tune Up-The Manly Salon and/or Balanced Foods, and to notify Company promptly following the consummation of any such sale.

9. **Confidential Information of Others.** Employee represents that (a) Employee's employment with Company shall not breach any contract, agreement or understanding, oral or written, to which Employee is a party or by which Employee is bound; (b) Employee's employment with Company will not cause Employee to disclose or use any confidential or proprietary information or trade secrets belonging to any other person or entity; and (c) Employee does not have and shall not bring to Company or use in connection with Employee's employment with Company any confidential or proprietary information or trade secrets belonging to another person or entity.

10. **Notification.** Employee acknowledges and agrees that Company may notify anyone employing or contracting with Employee or evidencing an intention to employ or contract with Employee of the existence and provisions of this Agreement.

11. **Enforcement.** Employee acknowledges and agrees that, by reason of the sensitive nature of the Confidential Information, Company Intellectual Property, Trade Secrets and Goodwill referred to in this Agreement, a breach of any of the promises or agreements contained herein will result in irreparable and continuing damage to Company for which there may not be an adequate remedy at law. If Employee violates any of the terms of this Agreement or threatens to

violate any of the terms of this Agreement, all Company obligations under this Agreement shall cease without relieving Employee of his or her continuing obligations hereunder. Employee acknowledges and agrees that, in addition to the recovery of damages and any other legal relief to which Company may be entitled in the event of Employee's violation of this Agreement, including, but not limited to, an equitable accounting of all profits and benefits arising out of such breach or threatened breach, and all losses, damages, costs and expenses arising therefrom, including, without limitation, reasonable attorneys' fees and costs, Company shall also be entitled to equitable relief (without the necessity of proving the inadequacy of monetary damages or the posting of any bond or security), including such injunctive relief as may be necessary to protect the interests of Company in such Confidential Information, Company Intellectual Property, Trade Secrets and Goodwill, and as may be necessary to specifically enforce this Agreement. Employee acknowledges and agrees that the covenants set forth in this Agreement shall not supersede or modify any other agreement between Employee and Company or any of its affiliates relating to restrictive covenants, including, without limitation, any covenants entered into under an equity incentive instrument or sale transaction agreement, and that any breach of the restrictive covenants under this Agreement or any such other agreement may be deemed a breach of one or both.

12. **Reformation and Severability.** Employee and Company intend and agree that if a court of competent jurisdiction determines that the scope of any provision of this Agreement is too broad to be enforced as written, the court should reform such provision(s) to such narrower scope as it determines to be enforceable. Employee and Company further agree that if any provision of this Agreement is determined to be unenforceable for any reason, and such provision cannot be reformed by the court as anticipated above, such provision shall be deemed separate and severable and the unenforceability of any such provision shall not invalidate or render unenforceable any of the remaining provisions hereof.

13. **Integration and Amendments.** This Agreement, including the initial paragraph and the recitals to this Agreement, each of which is incorporated herein and made part of this Agreement by this reference, is a complete agreement between the parties and supersedes all prior discussions, negotiations and agreements with regard to the subject matter herein, whether oral or written. This Agreement shall be binding upon and for the benefit of the parties and their respective heirs, executors, administrators, successors, devisees, permissible assigns, personal representatives, and legal representatives. No supplement, modification, or amendment to this Agreement shall be binding unless executed in writing by Employee and Company.

14. **Waiver.** Any waiver by either party of a breach of any provision of this Agreement shall not operate or be construed as, a waiver of any subsequent breach or provision hereof.

15. **Miscellaneous.**

a. *At-will Employment.* Nothing contained in this Agreement shall be deemed to alter or modify Employee's status as an at-will employee of Company or of any of its affiliates.

b. *Governing Law.* This Agreement shall be governed by, construed, and enforced in accordance with the laws of the State of Florida.

     c.     *Survival.*  Employee's obligations hereunder shall survive the termination of Employee's employment with Company or with any of its affiliates or any other agreement or relationship between Employee and Company or any of its affiliates.

     d.     *Assignability.* This Agreement and the rights, interests and obligations hereunder shall be assignable by Company.  This Agreement is not assignable by Employee.

     e.     *No Election of Remedies.*  Except as otherwise specifically provided herein, the rights and remedies accorded herein to Company are cumulative and in addition to those provided by law or in equity, and may be exercised separately, concurrently or successively.

     f.     *Counterparts.*  This Agreement may be executed in multiple counterparts.

16.    **Employee's Copy**.  EMPLOYEE ACKNOWLEDGES THAT EMPLOYEE HAS RECEIVED A COPY OF THIS AGREEMENT AND HAS READ, UNDERSTOOD AND AGREES TO BE BOUND BY THE TERMS AND CONDITIONS CONTAINED IN THIS AGREEMENT.

**[Signature Page Follows.]**

This Proprietary Matters Agreement has been executed as of the date first written above.

Franchise FastLane, LLC

By: _Carey Gille_____     _Ryan Logan_____

Its: ___CEO_____     _Ryan Logan_____, Employee

# EXHIBIT

# C

**From:** ███████████████ @franchoice.com>
**Sent:** Monday, July 28, 2025 5:05 PM
**To:** Candice Weeter <cweeter@franchisefastlane.com>; Candice Weeter <candice@sequelbrands.com>
**Subject:** FW: The Brothers That Just Do Gutters - Schedule Intro Call with Candice Weeter

You have point, he is on in August with you as he leaves for vacation to Oahu for 2 weeks tomorrow.


████████████

FranChoice Consultant

█████████████

██████████████

███████ @franchoice.com

www.franchoice.com/███████

Co-author of "Franchising Freedom", #1 best seller in both the USA and UK


**From:** ███████████████████
**Sent:** Monday, July 28, 2025 3:44 PM
**To:** Amanda Brich <abrich@franchisefastlane.com>
**Cc:** ████████████████ @franchoice.com>
**Subject:** Re: The Brothers That Just Do Gutters - Schedule Intro Call with Candice Weeter


Hi Amanda,


Thank you for reaching out.  I have scheduled a meeting on your calendar for August.  Look forward to speaking with you.

2

Please feel free to reach out to me beforehand if you have any questions.


Thank you,

██

███████████


On Mon, Jul 28, 2025 at 3:26 PM Amanda Brich <abrich@franchisefastlane.com> wrote:

Hi ███████████


We are excited for you to begin the Discovery Process for **The Brothers That Just Do Gutters!**


Let's get you scheduled for your Introduction Zoom Call with Candice Weeter, Director of Franchise Development!

Please click the link below and select the time that works best for you.

Schedule an Introduction Call


The call will last about 30 minutes. Once you've scheduled the call, you will receive a confirmation email and calendar invite.


*Never miss an appointment again! Opt in to our convenient text reminders to stay effortlessly updated on your upcoming schedule.*

*Click Here to Opt In*


Amanda Brich

Sales Support Specialist

Franchise FastLane

14301 FNB Parkway, Suite 312

Omaha NE 68154

531-365-0326